Pratt v. Davis.

---

## Edwin H. Pratt v. Parmelia J. Davis, by next friend.

### Gen. No. 11,723.

1. PHYSICIAN—*limit of discretion of, with respect to performing surgical operation.* Except in cases where the consent of the patient is express, or is implied by circumstances and occasions other than a mere general retainer for medical examination and treatment, and except, also, where there is a superior authority which can legally and rightfully dispose of the person of the patient, and which gives consent, a

surgeon has no right to violate the person of the patient by a serious major operation, or one removing an important part of the body.

2. HUSBAND—*authority of, to authorize operation upon wife.* The husband of a woman capable of consenting, has no authority in law to authorize the performance upon her of a surgical operation.

3. DAMAGES—*what, may be recovered for unauthorized performance of surgical operation.* In such case the law presumes damage, and in addition, actual and punitive damages may be recovered.

4. PUNITIVE DAMAGES—*what malice authorizes allowance of.* Where there has been trespass upon the person, such trespass is deemed malicious in law for the purpose of the allowance of punitive damages, if it appears to have been wilful and deliberate—hatred or spite not being an essential ingredient.

5. FORM OF ACTION—*when will not justify arrest of judgment.* The Practice Act has abolished the technical distinction between the two forms of action, trespass and trespass on the case, and where a particular action is entitled erroneously trespass on the case, a motion in arrest will not lie, especially if the defendant has interposed a demurrer, which being overruled, has been followed by his plea.

6. TRIAL BY JURY—*when plaintiff's waiving of, cannot be availed of by the defendant as a ground for reversal.* A defendant who has induced the plaintiff to waive trial by jury, cannot subsequently urge that the plaintiff was incapacitated to consent to such waiver, and that, therefore, it was not binding upon her as a ground for a reversal.

7. NEWLY DISCOVERED EVIDENCE—*when, not ground for new trial.* Newly discovered evidence, not of a controlling, but merely of a cumulative character, is not ground for the award of a new trial.

Action of trespass on the case, Appeal from the Circuit Court of Cook County; the Hon. MURRAY F. TULEY, Judge, presiding. Heard in this court at the March term, 1904. Affirmed. Opinion filed February 9, 1905. Rehearing denied February 20, 1905.

**Statement by the Court.** This is an appeal from a judgment in favor of appellee against appellant for $3,000 and costs, rendered in the Circuit Court of Cook County, December 22, 1903. The action was in trespass on the case.

The declaration in the cause contains but one count, which alleges that the defendant was exercising the profession of a physician and held himself out to the plaintiff to have and possess great knowledge and skill in his profession as physician and surgeon, and the plaintiff relying on the representations of the defendant as to his skill and ability and believing them to be true, on or about July 10, 1896,

Pratt v. Davis.

and while the defendant was exercising such profession, retained and employed the defendant as such physician for reward and hire to treat the plaintiff for a certain sickness and malady; that the defendant accepted such retainer, and represented to the plaintiff that he possessed and would exercise the requisite skill to successfully treat and cure her; that the plaintiff placed herself under the care and treatment of the defendant at a certain sanitarium in Chicago, owned or controlled by the defendant, at the defendant's request; that the defendant represented to the plaintiff that it would only be necessary for her to have medical treatment, and that no surgical operation would be necessary, but that after the plaintiff had so placed herself under the care of the defendant he, without the knowledge or consent of the plaintiff, or of any one authorized to act in her behalf, administered to the plaintiff an anæsthetic or narcotic, and while the plaintiff was or remained under the influence of the drug administered by the defendant, removed the uterus of the plaintiff. By reason whereof the plaintiff suffered great bodily pain and was confined to her bed for about six weeks, and plaintiff became and remained sick, sore and disordered, and her general health and mental powers have been greatly impaired, to the damage of the plaintiff of $25,000, etc.

A demurrer to the declaration having been overruled, the defendant filed a plea of the general issue and afterward, by leave of the court, a special plea that he was a duly licensed and practicing physician, and as such he was employed by the plaintiff to remove her uterus, and by leave and license of plaintiff to him for that purpose given and granted, committed the several supposed trespasses in said declaration mentioned, as he lawfully might for said cause.

A similiter was filed by plaintiff to the general issue and a replication to the special plea traversing the allegation of the employment of the defendant to remove the uterus of the plaintiff, and the leave and license charged in the plea, and averring that the said trespasses were committed

as charged in the declaration and without the consent of the plaintiff, and concluding to the country.

When the case was first reached for trial, the plaintiff not being ready for trial on account of the temporary absence of witnesses from the city, requested the defendant and his attorney to consent to a postponement of the trial of said cause. The defendant and his counsel gave consent thereto on condition that a jury should be waived and the cause submitted to the court, and in accordance with said condition thus made, the plaintiff's attorney assented thereto, and by agreement between counsel in open court, the defendant being personally present, an order was entered waiving a jury and setting the cause down for trial by the court. The cause was thereafter under said agreement tried before the court without a jury, resulting in a finding that the defendant was guilty and an assessment of the plaintiff's damages at $3,000. A motion was made for a new trial, based on various alleged errors committed by the trial court, including the giving of punitive or exemplary damages, and on the proposition that the waiver on behalf of the plaintiff of trial by jury was not binding on the plaintiff and that no final judgment could be entered on the finding in behalf of the plaintiff which would be binding on her, and on the allegation of newly discovered evidence. The motion for a new trial was overruled and an exception duly preserved. A motion in arrest of judgment was made and overruled and an exception preserved. The court thereupon entered judgment for $3,000, the entry of which judgment was excepted to and this appeal taken.

Twenty-three assignments of error are made on the record in this court, covering the various grounds relied on by the appellant for reversing the judgment, which will be considered in the following opinion.

The evidence at the trial was conflicting. So far as is deemed necessary it will be discussed also in the opinion.

WALKER & WILLIAMS and ROY C. MERRICK, for appellant.

SAMUEL J. HOWE, for appellee.

Pratt v. Davis.

MR. JUSTICE BROWN delivered the opinion of the court.

Counsel for appellant in this case lay stress in their presentation of it on the apparent injustice of mulcting in damages one who in no view of the case, they say, can be said to have been actuated by any purpose other than that of using his best efforts in a sincere desire to heal the afflicted. We should be very sorry to believe that the court below had ignored or that this court could ignore the considerations which underlie this expression of feeling. We think that both courts, however, recognize adequately the great obligations to medical and surgical skill, under which all civilized communities lie, and would be far from upholding any ungrateful attempt to make liable "for a failure to cure" one who, "free from every imputation of malice, wantonness, recklessness, lack of skill, or negligence," had used "whatever of skill, or learning and of material equipment were at his disposal," in the relief of the complaining party. Had this case, in the opinion of the court below, been such an attempt, there would have been no judgment; if it were so in the opinion of this court the judgment would be annulled. But great as are the obligations to which we have alluded, they do not confer on the surgeon or physician unlimited powers to use his own discretion in the surgical or medical treatment of patients who, suffering from some bodily ailment, come to him for advice and assistance. Undoubtedly an implied license "to have," as appellant's argument phrases it, "the proper remedial means brought to bear," often exists. The patient may by his whole course of conduct, without the use of any express language giving consent, evidently place his body at the entire disposal of the surgeon or physician whom he consults. For a soldier to go into battle with the knowledge beforehand that surgeons attached to the army are to have charge of the wounded, might perhaps be considered an implied license for such operations as the surgeons afterward in good faith perform. Perhaps, too, various cases which might be supposed of sudden and critical emergency, in which the surgeon would be held

justified in major or capital operations without express con-
sent of the patient, might be referred to the same principle
of an implied license.

But the broad statement put forward by appellant as a
correct proposition of law, that " when a patient places
herself in the care of a surgeon for treatment without in-
structions or limitations " (it is to be presumed this means
express limitations) " upon his authority, she thereby in
law consents that he may perform such operation as in his
best judgment is proper and essential to her welfare," is
not one to which we can give assent. We do not hold,
again to quote appellant's counsel, that there is " a uni-
versal acquiescence of lay and professional minds in the
principle that the employment of the physician or surgeon
gives him implied license to do whatever in the exercise of
his judgment may be necessary." On the contrary, under
a free government at least, the free citizen's first and great-
est right, which underlies all others—the right to the in-
violability of his person, in other words, his right to him-
self—is the subject of universal acquiescence, and this right
necessarily forbids a physician or surgeon, however skillful
or eminent, who has been asked to examine, diagnose, ad-
vise and prescribe (which are at least necessary first steps
in treatment and care), to violate without permission the
bodily integrity of his patient by a major or capital opera-
tion, placing him under anæsthetics for that purpose, and
operating on him without his consent or knowledge.
Counsel assert that not a case can be found in the Eng-
lish or American reports where a surgeon has been held
liable for performing an operation without the consent of
the patient. This is perhaps true. We have not been able
in our examination to find such a one, but it by no means
follows that the liability does not exist. It would rather
indicate that, obedient to the law and the code of profes-
sional ethics as well, surgeons have abstained from actions
from which the liability would accrue, or at least have not
carried the contention that it does not exist to the courts
of last resort. It is our opinion that except in cases where

the consent of the patient is express, or is implied by circumstances and occasions other than a mere general retainer for medical examination and treatment, and except also where there is a superior authority which can legally and rightfully dispose of the person of the patient, and which gives consent, a surgeon has no right to violate the person of the patient by a serious major operation or one removing an important part of the body. Illustrations of such superior authority as we allude to can be found in the control which the state takes of persons under sentence for crime, the power which is vested in parents over minor children of tender age, and the authority given to legally constituted guardians of the persons of those who are insane or imbecile. In a much restricted form it may be said to exist in the marriage relation, which makes the husband the head of the family. This last authority is not, however, supreme in the matter of surgical operations upon the person, and this is really the gist of the decisions in McClallen v. Adams, 19 Pickering, 333, and State v. Housekeeper, 70 Maryland, 162, which are urged on us in argument as showing that the consent of the husband of the appellant was not necessary in the case at bar. These decisions are not authority for the proposition that when a wife is herself incompetent from mental condition intelligently to give or withhold her consent, that the husband's consent is unnecessary, but for the very different proposition that where the wife, competent mentally to decide, assents to and desires a dangerous operation, the surgeon is justified in performing it (if it be in his judgment a proper one) without the further consent of the husband. As the Supreme Court of Maryland said in the Housekeeper case, " The law does not authorize the husband to say to his wife, you shall die of a cancer—you cannot be cured. * * * The consent of the wife, not that of the husband, was necessary." As to the patient's own conduct, the court, in the same opinion, says: " *They could not, of course, compel her to submit to an operation,* but if she *voluntarily* submitted to its performance her consent will be presumed, *unless she was the victim of a false and fraudulent misrepresentation.*"

That the consent of the patient herself to such an operation as was performed in the case at bar is necessary, if he or she be in a free condition and in such mental health as implies competency to decide, we do not believe has been denied by any court.    The case of Beatty v. Cullingworth, noticed in the Central Law Journal, vol. 44, page 153, and which apparently went no further than the *nisi prius* court, is certainly no authority to the contrary.    According to the criticism of the Central Law Journal, the learned judge erred, if he erred at all, in instructing the jury on the question of fact whether or not consent had been given by the patient—not by any such statement as that consent was unnecessary, or that it was implied by a general request for examination and treatment.

The first question, then, to be decided in the case at bar was whether or not the operation complained of had been performed with the consent, either express or implied, of the appellee, Parmelia Davis, herself.

It appears from the evidence that the plaintiff, who was about forty years old, had been afflicted with epilepsy for many years—ever since she was a young woman.    Her husband having heard, through his brother, of the defendant as a physician who was treating patients for epilepsy, went to the defendant's office and, according to the defendant's testimony, said that his wife suffered from epilepsy and that he wanted to know if the defendant could cure her. He was told by the defendant that defendant must have a personal interview with the patient.    In a day or two she came to his office with her husband.    What passed, if anything, in relation to the treatment to be given the plaintiff, between Dr. Pratt and the plaintiff's husband in her absence from the room, is a subject of dispute between them; but it is not claimed that the defendant to the plaintiff, or in her presence, spoke then of any serious operation.    The doctor, however, made an examination of her pelvic organs, in which he discovered, as he testifies, that the uterus was small, that it was lacerated and pinched, and that the condition of the last inch of the rectum was bad.    The doctor

insists that to the husband he said that the extent of the surgical interference that would be necessary for a cure was uncertain—that it might involve the removal of the organs before it was done with, but that the first thing to do was "what appeared on the surface, to loosen the head of the clitoris, to dilate and curette and operate for the laceration of the cervix of the uterus, and to put the rectum in repair," but to Mrs. Davis herself the doctor says he told only just enough to get her to consent to be operated on; that is, that the neck of the womb was torn and would have to be repaired. This and all the operations which the doctor spoke of as "appearing on the surface" are miner operations, much less serious and severe in execution and effects than the removal of the uterus.

The defendant seemingly considers the undeniable fact (which in his testimony he stated in immediate connection with the admission that this was all that he told the plaintiff was necessary), namely, that Mrs. Davis had epilepsy and wanted to recover from it, as proving an implied acquiescence in anything he might choose to execute in the way of surgery, and as a sufficient justification for assuming her consent to a major operation, of the necessity or likelihood of which he did not inform her.

Immediately thereafter the patient went to a hospital under the management of the defendant, and the next day he performed the operations upon her which he speaks of as "as appearing on the surface" as necessary—the principal object apparently being to treat the laceration of the womb. She stayed at this hospital or sanitarium about four weeks at this first visit.

During this time it is not claimed by the defendant that he obtained the consent of the plaintiff to the operation afterward performed, by which her uterus was removed, or that any indication that such an operation might be considered necessary by him was given to her. On the contrary, he says that "he did not deem her worthy of that," that "she was unfit for it," that "her mental condition was such that it was impossible to take her into advisement on her own case."

In another suit commenced by the plaintiff against the defendant shortly after she left the hospital, her attorney alleged in the declaration that her ovaries had been removed during this first stay at the hospital, and that she had consented thereto. From this it is argued by defendant's counsel that there must be implied an admission by the plaintiff of consent to the operation of which complaint is now made, or at least to a serious and major operation—for it is undisputed that but one such operation was performed, and by it both uterus and ovaries were removed.

But such a consent certainly cannot be attributed to the plaintiff personally, for the evidence of the defendant himself is positive to the effect that she was not informed or consulted about any such operation, nor was her consent obtained or asked. His testimony is that he told her that it would be necessary to repair the tear in her uterus to cure her, and that he told her this only because he wished her to come to the operating room without violence; that had she been a little more insane, he would " have sent her to another institution and put her to sleep in a bed in a cell." " I thought," he says, " that her mental condition was such that she could be influenced by what I told her to the extent of walking to the operating room instead of being carried." " I worked her deliberately, systematically, taking chances which she did not realize the full aspect of, deliberately and calmly deceived the woman. That is, I did not tell her the whole truth."

After the minor operations performed during this first stay in the hospital the plaintiff remained there, as before stated, about a month, and then returned home to her family. The evidence concerning the occasion for her return to the hospital or, sanitarium, which occurred on June 30, 1896, is conflicting. The plaintiff's husband testified that when he took his wife home the defendant said to him that he would like to have her back for a little further treatment, some little irritation, after she had been a week or two at home, and that in consequence of that he, on being suddenly called away on business, sent her again to the

Pratt v. Davis.

sanitarium with his brother. The defendant, on the other hand, says that after plaintiff had been away from the hospital for about two weeks, her husband reported to him that she was no better, and defendant then told him that it would be necessary for her to come back for the finishing work; that to this plaintiff's husband assented, and that in consequence she came back.

It appears that on the same day she returned Dr. Pratt put her, or had her put, under the influence of an anæsthetic and performed on her the major operation known as hysterectomy, which consisted in the removal of the ovaries and uterus from her body and rendered necessary an incision into the peritoneal cavity.

It does not appear clearly to us from the evidence whether on *this occasion* the anæsthetic was administered with or without her consent. Counsel for appellee assert in their brief that she was chloroformed in her bed, and without her knowledge, but we do not think the testimony bears out this statement with any certainty. Dr. Pratt did not know or remember whether the anæsthetic was administered while she was in her bed or on the operating-table, but he says that it was not an uncommon practice to administer the anæsthetic to patients in their beds and then convey them to the operating-room. We think this is often the course pursued in hospitals, and the fact, if it be a fact, that it was the one here taken would, in itself, prove nothing about the consent or want of it. On the other hand, we do not consider the doctor's statement that while plaintiff did not "receive full confidence, she had to have some in order to get her to take the anæsthetic," and that "she knew that she was to be operated on, and was willing that should be.done," is at all conclusive that she did know that *at this time* she was to be anæsthetized or operated on. The prior operation of sewing up the womb, performed during her first stay at the hospital, although a minor one, undoubtedly required her anæsthetization, and it might well have been to that occasion that the defendant referred in his testimony, especially

as the question asked him was whether plaintiff had ever said anything about the *operations* prior to the time they were performed, and as he added to the statement above quoted, " She knew that the womb was to be operated on, and she was willing that should be done. *Consent for further work was not obtained.*" But whether or not the plaintiff knew that an anæsthetic was to be administered to her at this second stay at the sanitarium, and consented thereto, it is certain and conceded that she was not told and did not know that a major operation involving the mutilation of the interior organs of her body was to be performed on her. Nor is there any reason from her conduct to suppose that she expected it or deemed it probable, or even possible. If she expected any operation at all, which to us seems very doubtful, it was clearly on the line of a completion of the work on the laceration and irritation of the organs which had been begun at the former visit—the preservation and cure rather than the removal of important functional parts of her body. Her husband testifies that when he visited the sanitarium to take her home after her first stay, his wife said to the defendant that she objected to any further operations, and that after the operation had been performed she told him that Dr. Pratt had performed another operation on her and against her wishes. Mrs. Howe, her sister, testified that very shortly after the operation—perhaps the next day—she heard the plaintiff tell the defendant that she had that morning been informed by the nurse that she had been operated on, and asked him insistently what right he had to operate on her without her consent. The defendant himself testified that, although he did not remember, yet it might be true that when, at the close of her first stay with him, he requested her to come back again to receive further treatment, she said that she would come back but would not submit to any further operations, for, he says : " She objected to almost everything that was done in any shape or manner to everybody."

In view of the testimony both for plaintiff and defendant, the existence of any consent, express or implied, on

the part of the plaintiff personally, must be eliminated from consideration.   The defendant has indeed disclaimed the express consent, and from his characterization of the plaintiff's condition as that of one " wholly incompetent to reason" when she first came to his institution, and as " aggravated " when she came for the second time, so that " she was then insane—emphatically," it is plain that he does not rely on any implied consent on her part, for he did not consider her competent to give one.

But as there seems to us serious doubt as to the correctness of the defendant's diagnosis of the plaintiff's mental condition when she came to the sanitarium, we have not thought it well to neglect this hypothesis of a personal consent implied from the plaintiff's conduct.

If, then, the plaintiff did not personally consent to the operation which is complained of, then under the doctrines which we have hereinbefore set forth, concerning the right of the citizen to inviolability of person, and concerning the duties and authority of surgeons, the defendant is liable to her in damages unless some controlling and superior authority rightfully empowered him to perform the operation.

The question of the amount and measure of damages we shall hereinafter take up, but it is elementary that for any trespass on the person, some damages are inferred by the law.   Sutherland on Damages, vol. 1, pp. 9, 11, 766; Sedgwick on Damages, vol. 1, sec. 97, sec. 104.

The defense we have indicated, defendant makes.   He asserts that the justification of the operation on his part springs from the consent of the husband of the plaintiff, and that the husband had the controlling and superior authority we have alluded to.   This last proposition he bases on the allegation of fact of the plaintiff's mental incapacity, or, as he terms it, her insanity, and on the legal assumption that in such case, there being no other legally appointed guardian or custodian of her person, the husband was solely in control of it.   This legal assumption it is not necessary to discuss, for it is not contested here, nor did the cause below, nor does this appeal turn upon it.

Without intending to lay down herein a rule to be quoted in subsequent cases where perhaps it might seem as dangerous to recognize in a husband an unlimited right to expose, without her consent, the body of an insane wife to the surgeon's knife, as it evidently is, in the eyes of the Legislature of Illinois, to allow a husband the right to restrain such a wife of her liberty without a judicial inquiry into her sanity, we may assume for the purposes of the present case, that as the husband is the head of the family and naturally the protector and guardian of an insane wife's interests, consent by him, implied or express, would justify the defendant and avoid the liability charged against him in this action. But it is obvious that to make good this defense, after it has been admitted or has otherwise appeared that no consent by the patient herself can be shown, the defendant must show two things affirmatively: First, that the patient was not mentally in a condition to be in control of her own body; and secondly, that her husband consented to the operation. Upon the defendant as to these matters lies the burden of proof. Jones on Ev., sec. 179; Mutual Reserve Fund Life Ass'n v. Powell, 79 Ill. App. 482; Chandler v. Smith, 70 Ill. App. 658; Messmore v. Larson, 86 Ill. 268. If the first of these propositions is not established by him, and it does not appear that the plaintiff was incompetent reasonably to give or to withhold her consent, proof of the second, that the husband did consent, would be futile. It would be a proposition utterly repugnant to the ideas of an advanced civilization that a husband merely by virtue of the marriage relation could thus control and dispose of his wife's person. The courts in cases cited *supra* have decided that a husband has no right in certain circumstances to forbid an operation that a wife wishes to subject herself to. Much more strongly would they deny that "the gentle restraint" of his wife's person, said to be the right of the husband, extends to compelling her to a capital or major operation without her consent. We are not of the opinion that the defendant did by a preponderance of the evidence

establish the plaintiff's incompetency to decide for herself on this operation at the time it was performed.

Counsel are right, undoubtedly, in saying that in popular opinion insanity is often erroneously connected with extraordinary symptoms, which are in truth often wholly absent in cases even of extreme mental alienation. But there is another fallacious opinion concerning mental alienation, which has gained less currency perhaps, but which is nevertheless entertained in some quarters. It is in the nature of the converse of the other. It is that a physical condition which at times affects unfavorably the mental condition and prevents the brain from actively and normally working, and perhaps causes at such times violent demonstrations, must be considered to have rendered the patient at all times insane, irresponsible and incapable of judging competently concerning his own most immediate and personal interests. This is not true. An epileptic patient, for example, may be in normal mental condition for much or most of the time, and during that time perfectly competent to judge of his or her own affairs, and to decide on matters affecting the important concerns of life, and yet be irresponsible for a short time before, and dazed and clouded in mind for a short time after, each attack. Such an epileptic patient the plaintiff may have been, and such a one we are disposed to think the evidence in this case, taken together, shows her to have been when she went to the plaintiff's sanitarium both the first and second time.

We are not unmindful of Dr. Pratt's own testimony to the fact that she was insane, " not possessed," as counsel expresses it, " of ordinary reasoning powers such as he was bound to recognize and consult before the operation," nor of that of his assistants; but to the contrary there is not only the testimony of those nearest her who were laymen, that the epileptic attacks prior to the operation seemed to have no further effect on her mental condition than to leave her for a short time in recovering from them somewhat dazed, but of a physician also, Dr. Fuller, who had treated her for epilepsy for four years and had lived as her

neighbor for thirteen, and saw her frequently, testified that he saw no signs of insanity in her at the time she went to the hospital to be operated on, nor had before; that she was very "quick and smart and active," and he thought "perfectly in her right mind." She apparently had up to that time exercised the ordinary judgment called for from a housewife, concerning her affairs, and whatever significance is to be given to the letter of Dr. Pratt, written to her under date of September 21, 1896, it certainly may fairly be said that it does not read like the letter of a physician to a person whom he believed "emphatically insane," " impossible to take into advisement on her own case," " wholly incompetent to reason or to submit to reason," " beyond self-control," " wholly incompetent to pass upon questions involving her treatment and care," " not worthy of telling what he was going to do," " unfit for that," etc. In that letter he tells her that he has previously directed her to practice self-control, to learn to be kind and gentle, and given her other instructions to follow, and that the best thing she could do was to stop her nonsense (by which he evidently meant discontinue the suit she had brought against him), and come down to his office and let him finish the work he had begun on her. The inconsistency between his testimony and this letter is obvious.

The strongest evidence in favor of the hypothesis of the plaintiff's insanity at the time of the operation is found in the fact, mentioned in the opinion of the learned judge who tried the cause, that the tendency of the disease of epilepsy is toward insanity, and that in May, 1898, about two years after the operation in question in this case, the plaintiff was adjudged a lunatic by a jury in the County Court, and is now indisputably and probably incurably insane, being confined at the Insane Asylum at Kankakee. The jury in the County Court found in May, 1898, that although mentally she was unusually acute, she had for ten years had epileptic attacks, increasing in frequency, " so that for the past four years " there had been " a gradual breaking down of her mental faculties;" that, however, " for the past eighteen months she had failed more rapidly

Pratt v. Davis.

mentally as well as physically;" that the cause of her insanity was epilepsy, the trouble being "possibly aggravated by improper surgical treatment." The jury also found that appellee had tried to jump in front of a moving train about two years before.

The learned trial judge in his opinion says: "The four years spoken of would antedate both the surgical operations performed by the defendant. This record of the County Court is at least *prima facie* evidence of the facts found." This may be so, without the conclusion following that Mrs. Davis was so "emphatically insane" in June, 1896, as not to be fit or worthy to be consulted about an operation involving the mutilation of her body. The evidence is clear that epilepsy may exist for many years without insanity; and it is entirely possible that for two years before the operation there should have been "a gradual breaking down of mental faculties," and yet no insanity. The attempt at suicide on the part of an epileptic sufferer does not in itself show insanity, even if it were shown by the finding to have been before, and not after, the operation complained of; and on the whole we can regard the finding of the County Court only as proving that in May, 1898, the appellee was insane. We can no more regard it as proving her insanity in 1896 than we can consider it as reflecting on the appellant's surgical treatment.

The trial judge did not pass on the question of the plaintiff's sanity. We think the preponderance of proof was that she was at the time this operation was performed on her in such mental condition that she should herself have been consulted as to the operation, and her own consent obtained before it was performed. It being, then, conceded that no such consent was expressly given, and it appearing from the evidence, in our opinion, that no such consent on her part was implied, we should be unable to disturb the finding for the plaintiff, however we might view the evidence concerning consent or the want of it on the part of the plaintiff's husband. In our view, he could not, without his wife's acquiescence, control the integrity of her body.

But if we should have reached another conclusion on this question of the plaintiff's sanity in May and June, 1896, we could not, as before set forth, have disturbed the finding for the plaintiff unless we reached the further conclusion that the consent of the husband was shown by the evidence. This we could not have done. The evidence on this point is conflicting.

The defendant relied on an alleged express consent given by Mr. Emery N. Davis when, with his wife, he came to the defendant's office in the first instance and requested an examination and treatment. "He gave me," says the Doctor, "*carte blanche* to use my own discretion, except, of course, to do as little as possible." "I told him I hoped I would not have to do anything more than the first work. At the same time I would have to have his free permission to do whatever I thought best for the case or I would not have anything to do with the case, and to that he consented. That is the only time I talked to him about the matter." "Mr. Davis did not tell me at any time that he did not want any more surgical work done." This conversation Mr. Emery N. Davis explicitly denies. He says, on the contrary, that on the occasion when this conversation is alleged to have taken place, what the doctor, after examination, did say was that he thought he could cure plaintiff, that the uterus was, lacerated and probably would have to be sewed up, and that after this was done at the plaintiff's first stay at the sanitarium and as he was taking plaintiff home, Dr. Pratt said there was some little irritation that needed further treatment and he would like to have her brought back after a week or two for such further treatment, when he thought she would be all right. Thereupon, Mr. Davis says, he told Dr. Pratt that he objected to any further operations, and his wife also, in his presence, said the same thing; that she went back at the doctor's request, because the doctor had said "there was some little irritation that really needed further treatment."

Mr. Davis says that he first learned of the serious operation of removing the uterus and ovaries when he returned

from his weekly business trip; that his wife then informed him that Dr. Pratt had performed another operation on her against her wishes; that he went to the doctor and asked him what he had done, and what he meant by doing anything of the kind, and that the doctor answered him that he had removed the ovaries and uterus because he *thought* Mr. Davis wanted him to use his best judgment.

Mrs. Howe, the plaintiff's sister, testified that when, after the operation, plaintiff complained to the defendant of what he had done, the defendant said, " I did not think, Mrs. Davis, it was well to tell you.  I consulted with your husband and he told me to do whatever I thought best." Plaintiff said, " Dr. Pratt, when did you talk with my husband ?"   Defendant said, " When you came back here the other day—this last time."   Plaintiff said, " You are telling what is not true, because my husband was miles away from Chicago—he was out on the road and did not come here with me."   (This was the fact.)   Defendant said, " It does not matter anyway.   I did it for your good, and I have done my part," etc.

Dr. Pratt testified as to this conversation that he simply said to plaintiff, " I have done nothing I was not authorized to do," and that he would not agree with Mrs. Howe as to the details of the conversation.

Dr. Pratt's letter to the plaintiff after the operation and a suit had been begun against him, makes no mention of a consent or direction from her husband.   He testified, as before stated, " that he did not remember whether she said in Mr. Davis' presence that she would come back again, but that she would not submit to any further operation.   That it might be."

When the plaintiff went back to the hospital she was accompanied by her husband's brother, who had no authority to give and gave no instructions or directions as to treatment.   The husband was away on a short business trip.   Both her sister and husband had visited her when she was at the sanitarium the first time, but neither was present or near at the time the operation was performed,

which, under the circumstances, was strange, if the husband's consent to a major operation had been given and such operation therefore might have been expected.

We are satisfied on this state of the evidence that the trial judge was right in his finding that the preponderance of the evidence on this point of the husband's consent, is that it was not given for the performance of this major operation. We should arrive at this same conclusion from an examination of the record alone, and we are fortified in our position that it should not be overturned (if it were necessary to the finding in this case) by the consideration that the trial judge saw and heard the witnesses and could better judge of the weight of their testimony than can we. This is an especially significant consideration when the language of the judge in his opinion is noted. Our conclusion is, therefore, that whether the evidence were to be considered as showing the plaintiff sane or insane at the time of the operation, she would in either case be entitled to recover. This leaves only the question of the amount or measure of damages to be considered.

There was some expert testimony tending to show that the operation, although not in itself charged to be unskillfully or improperly performed, was not good practice, and other evidence tending to show that it aggravated and intensified the disease which it was intended to cure, and hastened at least the culmination of plaintiff's mental breakdown in unmistakable and hopeless insanity. But there was evidence tending to establish the contrary of these propositions, and under the state of the pleadings, in which the declaration counts for the removal of the uterus and not for the removal of the ovaries, the court below could not, as he says, discriminate between the effect of the removal of the ovaries and the effect of the removal of the uterus in causing or aggravating the insanity of the plaintiff. The most that can be said of it is that the operation plainly did no good. Whether it did harm in the manner claimed cannot be known. Therefore we agree with the trial judge that the court would not have been justified in

allowing damages on the theory that the operation caused or aggravated plaintiff's tendency to insanity, and that the question as to damages resolved itself into this:   What damages should be assessed against the defendant for an unauthorized act of removing the uterus of the plaintiff ?

The law infers damages when any trespass on the person of another is committed.   It infers bodily pain and suffering from such an act, and allows damages for them, however difficult they may be of ascertainment or apportionment.   As the trial judge said:   " The court may allow for the bodily pain and suffering which the individual suffered in the commission of the act upon or against him, although no permanent injury may result, and although he may, by bad pleading, be barred from recovering for permanent injuries, if any resulted."   Sutherland on Damages, vol. 1, p. 766; Sedgwick on Damages, chapter 2; Deyo v. Van Valkenburgh, 5 Hill, 242;   Baldwin v. Western R. R. Corp., 4 Gray, 333.

The court below taking, if it is to be presumed, these damages inferred into account, implies by his opinion that he added exemplary damages against the defendant, with a view of preventing similar acts in the future.   We think that it was within his power to award such damages; that this was a proper case for its exercise, and that the amount given was a moderate and judicious one under all the circumstances shown.   The amount was peculiarly within his discretion sitting, as he did, in the place of a jury.

Counsel for appellant object to this award of exemplary damages, on the ground that no exact amount of actual damage was shown or could be apportioned, and assert that the rule is that exemplary or punitive damages cannot be allowed unless " actual damages " are found.   If counsel uses the term " actual damages " as distinguished from nominal damages, which must follow any unauthorized trespass on the person of another, they mistake the law.   The correct statement, on the contrary, is, if a case is otherwise a proper one for punitive or exemplary damages, they can be given wherever there is a right of action in the plaintiff,

though his loss is but nominal. Sedgwick on Damages, sec. 361; Wilson v. Vaughn, 23 Fed. Rep. 229, and cases therein cited.

It is also urged that exemplary damages are only proper " when malice, violence, oppression or wanton recklessness " are shown. This may be considered as true, if to these words are attached only their precise and technical meaning in the law. It will not do to say that neither malice, violence or recklessness was shown on the part of the defendant, because there is no claim that he was actuated by dislike, hatred or a desire ultimately to injure the plaintiff in what he did. He probably thought, as it is in evidence he said to plaintiff's brother-in-law, that the operation would do no ultimate harm, and might do good. If the act was an unauthorized trespass on the body of the plaintiff—if it was an act, in other words, in the mutilation of her body, which he knew, or was bound, in the eye of the law, to know, he had no legal right to do—the absence of such a morally evil intention as is before indicated, does not relieve it from the imputation of malice in its legal sense. It was wilful, and the deliberate intention to commit an act which defendant was bound in the eye of the law to know was illegal, was there. That makes malice in the legal sense. It was violent, oppressive, wanton and reckless, in the same sense. To hold otherwise would be to throw around intentional and wilful indefensible acts protection, because of ignorance of the law, which every man is presumed to know, or because of a disposition to ignore and defy the law for ends deemed justifiable by the offender. It could be argued on such a basis that exemplary damages were not proper in a given assault and battery case, because the defendant had chosen to believe his victim would be in the end, morally better for a beating. The law does not approve or tolerate such reasoning. In such a case of intentional disregard of the rights of others, it allows exemplary damages. Sedgwick on Damages, secs. 350–351; Tillotson v. Cheetham, 3 Johnson, 56–67; Wilson v. Vaughn, *supra;* Day v. Woodworth, 13 Howard, 363–371; Harrison v. Ely,

120 Ill. 83; Dorsey v. Manlove, 14 Cal. 553; Goetz v. Ambs, 27 Mo. 28; Hendrickson v. Kingsbury, 21 Iowa, 379–391; Cochran v. Miller, 13 Iowa, 128; Cook v. Ellis, 6 Hill, 466; Cole v. Tucker, 6 Texas, 266; Meidel v. Anthis, cited by the appellant's counsel, has been overruled; Lowry v. Coster, 91 Ill. 182.

That which we have said in this opinion disposes sufficiently of all the questions raised on the propositions of law held or refused by the trial judge. It is unnecessary to discuss them in detail.

As to the admission of incompetent evidence, if any such was admitted, it must be presumed that the trial judge ignored it in his finding. Mer. D. T. Co. v. Joesting, 89 Ill. 152; Johnston v. Miller, 103 Ill. App. 181.

We are not of opinion that the point made by the appellant, that the judgment should have been arrested because the form of the action was wrong, in that it was trespass on the case instead of trespass, is well taken. It is answered by the statute, which abolished the distinction between the two forms of action, for the purpose of eliminating this technical defense. Moreover, the objection, if it existed, would have been waived by pleading over after a demurrer was overruled.

Nor can the appellant take advantage of the point that a jury was waived, although the plaintiff was insane. Though a jury trial is a constitutional right, its absence is not a jurisdictional defect. The record shows that the jury trial was waived at appellant's instance. He cannot complain. He is estopped. If he doubted the finality of the judgment rendered on such a trial as he insisted on, he should not have so insisted, or indeed consented.

The appellant urges that the motion for a new trial should have been granted on the ground of newly discovered evidence. We do not agree with this contention. The evidence of Miss Sandberg, if it had been given, was not controlling, certainly, in view of our opinion, that the plaintiff's own consent was necessary to authorize the operation. It was, in any event, cumulative, as to the husband's consent;

it is not shown that diligence had been used to procure it before the trial, and it would have contradicted the defendant's own testimony as to his conversations with Mr. Davis.

The judgment of the Circuit Court is affirmed.

*Affirmed.*