DARLENE FICKE, Special Adm'r of the Estate of Dorothy Ficke, Deceased, *et al.*, Plaintiffs-Appellants, v. EVANGELICAL HEALTH SYSTEMS, d/b/a Christ Hospital, *et al.*, Defendants-Appellees.

First District (6th Division)   No. 1—96—0238

Opinion filed December 13, 1996.

CERDA, J., concurring in part and dissenting in part.

Berkson, Gorov & Levin, Ltd., of Chicago (Arthur M. Gorov and Norman N. Berkson, of counsel), for appellants.

Cassiday, Schade & Gloor, of Chicago (Brian C. Sundheim, Catherine L.

Garvey, and Jennifer A. Keller, of counsel), for appellee Evangelical Health Systems.

John V. Smith II and Donald B. Lenderman, both of Pretzel & Stouffer, Chartered, of Chicago (Robert Marc Chemers and Anne Scheitlin Johnson, of counsel), for appellee Jose Aruguete.

JUSTICE GREIMAN delivered the opinion of the court:

This case presents the questions of whether, to what extent and to whom a hospital and physician may be liable for alleged violations of the Illinois Health Care Surrogate Act (the Act) (755 ILCS 40/1 *et seq.* (West 1992)). The Act authorizes a surrogate to decide, subject to certain conditions, whether to discontinue life-sustaining medical treatment when the patient is found to lack decisional capacity.

On December 9, 1993, plaintiffs, Darlene, Thomas and Michael Ficke, filed a four-count complaint against Evangelical Health Systems (the Hospital) and Dr. Jose Aruguete (Aruguete), seeking damages for injuries sustained by plaintiffs' decedent, Dorothy Ficke (Ficke). Plaintiffs maintained, in count I of their second amended complaint, that the Hospital was liable to decedent's estate for its failure to comply with certain provisions of the Act. Count III claims that the Hospital is similarly liable to Ms. Ficke's children for such violations. Count IV seeks damages pursuant to the Act for physical and mental injuries incurred by plaintiffs as a result of Aruguete's negligent treatment of Ficke and misapprehension of the Act. Count II of the amended complaint, brought by the estate against Aruguete, was dismissed with leave to refile and is not before this court on appeal.

In a memorandum opinion and order entered on December 21, 1995, the trial court dismissed with prejudice counts I, III and IV of plaintiffs' second amended complaint. On January 11, 1996, plaintiffs timely filed their notice of appeal from the trial court's order of dismissal. For the reasons that follow, we affirm.

The following facts are adduced from plaintiffs' second amended complaint. Ficke was admitted to the Hospital, under the care of Dr. Aruguete, on March 8, 1993, with the diagnosis of a CVA (stroke). Ficke was 81 years old with a recent history of diabetes, arthritis, gout, hypertension, congestive heart failure, respiratory disease and depression. A "do not recessitate" (DNR) order was entered in Ficke's chart on March 17, 1993.

Plaintiffs' complaint alleges that on or shortly after her admission to the Hospital, Ficke lacked decisional capacity and suffered from a "qualifying condition" as to the operation of the Act because

she lacked the ability to communicate meaningful thought, was unable to socially interact and lacked awareness of self and her environment. During Ficke's stay at the Hospital, Aruguete continued to prescribe treatment, including surgery, which the Hospital provided. These acts of rendering life-sustaining or life-prolonging intervention were contrary to the plaintiffs' expressed wishes. Moreover, the failure of the Hospital and Aruguete to inform plaintiffs of their rights under the Act, in addition to their own, independent, noncompliance with the Act's terms, violated the Act and caused plaintiffs' injuries.

As a general principle of Illinois law, competent adults have the right to refuse any type of medical care, including life-sustaining treatment. The right to refuse medical care has been recognized under constitutional right-to-privacy principles and is deeply ingrained in common law principles of individual autonomy, self-determination, and informed consent. See generally S. Fatum, R. Kane, & T. LeBlang, *A Review of the Illinois Health Care Surrogate Act*, 80 Ill. B.J. 124 (1992); see also *Union Pacific Ry. Co. v. Botsford*, 141 U.S. 250, 251, 35 L. Ed. 734, 737, 11 S. Ct. 1000, 1001 (1891) ("No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law").

Although the right is recognized, implementation of that right, traditionally through judicial intervention, has been cumbersome and often untimely, in many instances resulting in the very manner of death sought to be avoided by patients prior to legal vindication of their right to forgo treatment. See, *e.g.*, *In re Conroy*, 98 N.J. 321, 342, 486 A.2d 1209, 1217 (1985); *Bartling v. Superior Court*, 163 Cal. App. 3d 186, 190, 209 Cal. Rptr. 220, 221 (1984); *John F. Kennedy Memorial Hospital v. Bludworth*, 452 So. 2d 921, 923 (Fla. 1984); *Satz v. Perlmutter*, 379 So. 2d 359 (Fla. 1980); *Corbett v. D'Alessandro*, 487 So. 2d 368, 369 (Fla. App. 1986); *In re L.H.R.*, 253 Ga. 439, 321 S.E.2d 716 (1984); *In re Spring*, 380 Mass. 629, 631, 405 N.E.2d 115, 117-18 (1980); *In re Storar*, 52 N.Y.2d 363, 369, 420 N.E.2d 64, 66, 438 N.Y.S.2d 266, 268 (1984); *In re Hamlin*, 102 Wash. 2d 810, 689 P.2d 1372 (1984).

■ In Illinois, legislative response in this area first took the form of the Illinois Living Will Act (Will Act) (755 ILCS 35/1 *et seq.* (West 1992)). The Will Act recognized that individuals "have the fundamental right to control the decisions relating to the rendering of their own medical care, including the decision to have death delaying procedures withheld or withdrawn in instances of a terminal condition." 755 ILCS 35/1 (West 1992). Under the Will Act, individuals

can document their wishes concerning life-sustaining treatment before they develop a terminal condition and lack the capacity to make such a decision. 755 ILCS 35/3 (West 1992). However, living wills soon proved too inflexible to adequately address the needs of individuals wishing to make advance health care decisions. They were applicable only in cases of terminal illness, which requires that death be imminent. Moreover, they would not permit health care providers to withhold or withdraw artificial nutrition or hydration when such action would be the sole cause of death. See 80 Ill. B.J. at 125.

■ Subsequently, the Illinois legislature passed article IV of the Powers of Attorney for Health Care Law (Powers of Attorney Law) (755 ILCS 45/4—1 (West 1992)), which permits an individual to delegate, "without limitation, all powers an individual may have to be informed about and to consent to or refuse or withdraw any type of health care for the individual and all powers a parent may have to control or consent to health care for a minor child." 755 ILCS 45/4—3 (West 1992). Thus, absent the limitations present in the Will Act, the Powers of Attorney Law provides a more comprehensive and effective means of delegating health-care decisions. Yet, under either statutory scheme, no provision is made for individuals who lack decision-making capacity and who have not executed a living will or a power of attorney for health care.

■ Two supreme court decisions addressed this "gap" and found a right to refuse life-sustaining treatment in our state's common law and in the provisions of the Probate Act of 1975 (755 ILCS 5/1—1 *et seq.* (West 1992)). *In re Estate of Longeway*, 133 Ill. 2d 33 (1989); *In re Estate of Greenspan*, 137 Ill. 2d 1 (1990). The court held that a surrogate can exercise the right for an individual lacking decisional capacity only if: (1) the individual is terminally ill as defined in section 2(h) of the Will Act; (2) the individual has been diagnosed as irreversibly comatose or in a persistently vegetative state; (3) the individual's attending physician and at least two other consulting physicians have concurred in the diagnosis; (4) the individual's right outweighs any interests of the State; (5) what the individual would have decided is ascertained through clear and convincing evidence; and (6) a court enters an order allowing the surrogate to exercise the individual's right to refuse or terminate treatment. *Longeway*, 133 Ill. 2d at 47-53; *Greenspan*, 137 Ill. 2d at 16.

■ Thus, while legislative enactments improved and expedited surrogate decision-making where advance directives were executed through either a living will or power of attorney, individuals not "covered" by either statute remained dependent on judicial interven-

tion and its attendant flaws. In response, the Illinois Health Care Surrogate Act was passed in 1991. The Act codifies Illinois' common law and constitutional rights to forgo life-sustaining treatment and establishes a private decision-making process allowing a surrogate to be chosen from a hierarchical list of candidates to make life-sustaining treatment decisions for those who lack decisional capacity and have not executed an applicable living will or power of attorney. See *In re C.A.*, 236 Ill. App. 3d 594, 622 (1992) (McMorrow, J., dissenting); 80 Ill. B.J. at 127.

The Act applies when the individual lacks decisional capacity, has not executed an advance directive and has a "qualifying condition." "Qualifying condition" is defined as follows:

"[T]he existence of one or more of the following conditions in a patient certified in writing in the patient's medical record *by the attending physician* and by at least one other qualified physician:

(1) 'Terminal condition' means an illness or injury for which there is no reasonable prospect of recovery, death is imminent, and the application of life-sustaining treatment would only prolong the dying process.

(2) 'Permanent unconsciousness' means a condition that, to a high degree of medical certainty, (i) will last permanently, without improvement, (ii) in which thought, sensation, purposeful action, social interaction, and awareness of self and environment are absent, and (iii) for which initiating or continuing life-sustaining treatment, in light of the patient's medical condition, provides only minimal medical benefit.

(3) 'Incurable or irreversible condition' means an illness or injury (i) for which there is no reasonable prospect of cure or recovery, (ii) that ultimately will cause the patient's death even if life-sustaining treatment is initiated or continued, (iii) that imposes severe pain or otherwise imposes an inhumane burden on the patient, and (iv) for which initiating or continuing life-sustaining treatment, in light of the patient's medical condition, provides only minimal medical benefit." (Emphasis added.) 755 ILCS 40/10 (West 1992).

The Act further provides:

"The determination that a patient has a qualifying condition creates no presumption regarding the application or non-application of life-sustaining treatment. *It is only after a determination by the attending physician* that the patient has a qualifying condition that the surrogate decision maker may consider whether or not to forgo life-sustaining treatment. In making this decision, the surrogate shall weigh the burdens on the patient of

initiating or continuing life-sustaining treatment against the benefits of that treatment." (Emphasis added.) 755 ILCS 40/10 (West 1992).

It is against this backdrop that we are asked to determine whether, and to what extent, liability predicated on a health care provider or physician's violation of the Act may be imposed.

Our review of an order of involuntary dismissal is *de novo. Dace International, Inc. v. Apple Computer, Inc.*, 275 Ill. App. 3d 234 (1995). In reviewing a dismissal pursuant to section 2—619 of the Code of Civil Procedure (735 ILCS 5/2—619 (West 1992)), we must determine whether the allegations in the complaint, when read in the light that most favors plaintiff, are sufficient to set forth a cause of action upon which relief may be granted. *Regan v. Ivanelli*, 246 Ill. App. 3d 798 (1993).

I. Plaintiffs' claims against the Hospital

Count I of plaintiffs' second amended complaint is a survival action brought on behalf of Ficke's estate which alleges that the Hospital was negligent in (1) failing to obtain certification of Ficke's "qualifying condition," (2) providing treatment to Ficke contrary to the wishes of her children (plaintiffs), (3) failing to inquire into the availability of a surrogate, (4) failing to advise plaintiffs of their rights under the Act, and (5) failing to effectuate Ficke's transfer to another hospital. Count III of the complaint makes similar allegations and is brought by plaintiffs in their individual capacities for the anguish they each suffered as witnesses to their mother's unnecessary suffering.

To state a cause of action for negligence, a complaint must allege facts sufficient to show the existence of a duty, a breach of that duty, and an injury to the plaintiff that was proximately caused by that breach. *Kirk v. Michael Reese Hospital & Medical Center*, 117 Ill. 2d 507, 525 (1987). The Hospital moved to dismiss counts I and III, maintaining that plaintiffs failed to state a cause of action because the Act does not impose a duty on hospitals prior to the finding and certification by the attending physician that a patient lacks decisional capacity and has a qualifying condition.

The question before us is largely one of statutory interpretation. The fundamental canon of statutory construction is to ascertain and give effect to the intention of the legislature. *Varelis v. Northwestern Memorial Hospital*, 167 Ill. 2d 449, 454 (1995). Courts will look first to the words of the statute (*Metropolitan Life Insurance Co. v. Washburn*, 112 Ill. 2d 486, 492 (1986)), for the language used by the legislature is the best indication of legislative intent. *Kirwan v.*

*Welch*, 133 Ill. 2d 163, 165 (1989). When such language is clear, no resort to other tools of interpretation is necessary. *Henry v. St. John's Hospital*, 138 Ill. 2d 533, 541 (1990).

■ Section 25 of the Act requires the health care provider to "make a reasonable inquiry as to the availability of possible surrogates listed in items (1) through (4) of this subsection." 755 ILCS 40/25(a) (West 1992). However, this duty arises only when "a patient has a qualifying condition and lacks decisional capacity." 755 ILCS 40/25(a) (West 1992). The Act provides that the "determination that an adult patient lacks decisional capacity shall be made *by the attending physician to a reasonable degree of medical certainty*." (Emphasis added.) 755 ILCS 40/20(c) (West 1992). Further, "[t]he existence of a qualifying condition shall be documented in writing in the patient's medical record by the attending physician and shall include its cause and nature, if known." 755 ILCS 40/20(e) (West 1992). The Act clearly, and in mandatory terms, obligates the attending physician to *medically diagnose* both lack of decisional capacity and the existence of a qualifying condition, including its cause. We find this entirely appropriate and almost inescapable since it is the physician's province to treat and diagnose his or her patients. This is particularly true when the determination involves a potential life or death decision.

Accordingly, it is for the attending physician, not the hospital or its staff, to determine whether the Act applies to a particular patient. Absent the attending physician's determinations that a patient lacks decisional capacity and suffers from one of three qualifying conditions, the patient is "presumed to have decisional capacity in the absence of *actual notice to the contrary without regard to advanced age*." (Emphasis added.) 755 ILCS 40/20(c) (West 1992); *In re Estate of Austwick*, 275 Ill. App. 3d 665, 668 (1995). Thus, contrary to plaintiffs' argument, shared by the dissent, constructive "notice" or what the Hospital perhaps should have known is insufficient to trigger the Hospital's duties under the Act.

The Act does not, as the dissent observes, require hospitals to make "some effort to initiate the process of surrogate decision making." 285 Ill. App. 3d at 897. Conversely, initiation or identification of the process of surrogate decision making is the responsibility of the patient's attending physician. The legislature is quite clear on this point, and we find such delineation necessary to avoid potential conflicts between physicians and other health care providers that might serve to frustrate or prolong what was intended to be a swift, doctor-patient diagnosis.

Because there is no duty on the part of the hospital to inquire

into the availability of a surrogate until a finding has been made by the attending physician that the patient lacks decisional capacity and has a qualifying condition,[1] the trial court was correct to dismiss the claims against the Hospital, brought by both the estate and the plaintiffs individually.

## II. Plaintiffs' claims against Dr. Aruguete

■ Count IV of plaintiffs' amended complaint alleges that plaintiffs, as witnesses to Ficke's "continued pain and suffering," were, by virtue of Aruguete's negligent conduct, "caused to and did suffer grievous and painful injury, physical and mental, and do and will, in the future, continue to so suffer." Initially, we observe that the death of a parent is indeed an event occasioned by the continued suffering or grieving of the decedent's family. However, it is another matter whether the Act authorizes a cause of action for such injury.

The Act does not contain an express right allowing family members of patients to assert a cause of action for violation of its terms. However, a private right of action may be implied if the plaintiff is a member of the class for whose benefit the Act was enacted, the cause of action is consistent with the underlying purpose of the Act, the plaintiff's injury is one the Act was designed to prevent, and a cause of action is necessary to provide an adequate remedy for violations of the Act. *Corgan v. Muehling*, 143 Ill. 2d 296, 312-13 (1991); *Sawyer Realty Group, Inc. v. Jarvis Corp.*, 89 Ill. 2d 379, 391 (1982).

Although we believe that a patient's estate has a private right of action under the Act, the same cannot be said for a patient's family members or loved ones. Although plaintiffs are correct that the Act was intended to aid both the incompetent patient and other "involved

---

[1]Although no such independent duty exists under this act, the Federal Patient Self-Determination Act, passed in 1990, requires all health care providers receiving medicaid or medicare to inform all competent adult patients, even those admitted for minor procedures, about state laws on an individual's decisional rights and advance directives and to record any such directive the patient might have. The federal Act only provides termination of federal revenue as a sanction for its violation. Omnibus Budget Reconciliation Act of 1990, Pub L. No. 101—508, 104 Stat. 1388 (42 U.S.C.A. § 1395cc (West 1992 & Supp. 1995)). In some instances, private efforts have been made to supplement the physician's role in this process. For example, following the *Quinlan* case, approximately 85% of New Jersey's acute-care hospitals established prognosis committees that review the attending physician's prognosis when withdrawal of life-support is under consideration. See *In re Matter of Jobes*, 108 N.J. 394, 421, 529 A.2d 434, 448 (1987).

parties" (755 ILCS 40/5(a) (West 1992)), a cause of action for such "involved parties" was not similarly contemplated.

In the present case, allowing plaintiffs a cause of action under the Act is not "necessary to provide an adequate remedy for violations of the Act." *Corgan*, 143 Ill. 2d at 312-13. This can be accomplished where a patient or a patient's estate brings a direct action against a physician for violations under the Act. Moreover, extending a cause of action to witnesses of a patient's suffering raises serious practical concerns, including when and for whom does one "draw the line"? That is, who is able to maintain an action for damages? Immediate family members, individuals with five or more visits to the patient's "death bed," or only those friends or relatives who actually cared about the decedent? At best, this would prove to be an inexact process and one that conflicts with the traditional rule of limiting claims in the medical arena to the "patient-hospital or patient-doctor relationship." *Kirk*, 117 Ill. 2d at 528. Accordingly, we affirm the trial court's dismissal of count IV.

For the reasons set forth above, we affirm the trial court's order of dismissal.

Affirmed.

GALLAGHER, J., concurs.[2]

JUSTICE CERDA, specially concurring in part and dissenting in part:

I concur with the majority's affirming of the dismissal of counts III and IV, but I dissent on the affirming of the dismissal of count I against Christ Hospital.

A private right of action can be implied under a statute if (1) plaintiff is a member of the class for whose benefit the statute was enacted; (2) it is consistent with the underlying purpose of the statute; (3) plaintiff's injury is one the statute was designed to prevent; and (4) it is necessary to provide an adequate remedy for violations of the statute. *Corgan v. Muehling*, 143 Ill. 2d 296, 312-13, 574 N.E.2d 602 (1991). When a statute is enacted for the protection of a particular class of individuals, a violation of its terms may result in civil liability even if that remedy is not mentioned in the statute. *Corgan*, 143 Ill. 2d at 313, citing *Heimgaertner v. Benjamin Electric Manufac-*

---

[2]Justice Rizzi originally heard oral argument in this case prior to his retirement. Justice Gallagher was substituted and has reviewed the record, briefs and audio recording of the oral argument.

*turing Co.*, 6 Ill. 2d 152, 155, 128 N.E.2d 691 (1955). It is not necessary to show a specific legislative intent to create a private right of action. *Sawyer Realty Group, Inc. v. Jarvis Corp.*, 89 Ill. 2d 379, 386, 432 N.E.2d 849 (1982). If there is no indication that the remedies available are only those expressed in the statute, then where it is consistent with the statute's underlying purpose, a private right of action can be implied. *Sawyer*, 89 Ill. 2d at 386.

The public policy underlying certain statutes demands implication of a private remedy to compensate an aggrieved person who belongs to the class of persons whom the statute was designed to protect. *Sawyer*, 89 Ill. 2d at 386-87. Consideration of the underlying policy of the statute and the overriding purpose is important in determining whether a private right of action exists. *Sawyer*, 89 Ill. 2d at 387. Illinois courts have continually demonstrated a willingness to imply a private remedy where there exists a clear need to effectuate the purpose of a statute. *Sawyer*, 89 Ill. 2d at 389.

I conclude that there is a viable cause of action for a patient who lacks decisional capacity and who has a qualifying condition when health care providers did not comply with the Act's requirements. Dorothy Ficke was a member of the class for whose benefit the statute was enacted. A private cause of action is consistent with the underlying purpose of the statute, the injury to Dorothy Ficke is one the statute was designed to prevent, and a private cause of action is necessary to provide an adequate remedy for violations of the statute.

Count I against the Hospital alleged that Dorothy Ficke lacked decisional capacity and suffered from a qualifying condition within the meaning of the Act in that she was "lacking in communication of meaningful thought, social interactions and/or awareness of self and her environment." For such a patient, the health care provider, which is defined as including not only physicians but nurses and hospitals (755 ILCS Ann. 40/10 (West Supp. 1996)), must make a reasonable inquiry as to the availability and authority of a health care agent or, if unavailable, the availability of possible surrogate decision makers. 755 ILCS Ann. 40/25(a) (West 1992).

The Hospital argues that this duty of health care providers is not triggered before the existence of the qualifying condition and the lack of decisional capacity is certified in writing in the patient's medical record by the attending physician and by at least one other qualified physician. While it is only after these written certifications are made that a surrogate decision maker may consider whether to forgo life-sustaining treatment (755 ILCS Ann. 40/10 (West Supp. 1996)), the hospital need not and should not wait to make the reason-

able inquiries until the written certifications are made when the hospital knows or should know that the patient in its care lacks decisional capacity and probably has one of the three qualifying conditions.

Although the attending physician is in charge of a patient's treatment, the hospital has sufficient knowledge of the condition of its patients to determine whether it is probable that a surrogate decision maker is needed. Nurses monitor the patient's condition, and physicians and nurses make notes in the patient's medical record. Hospitals should facilitate the process of surrogate decision making and should not be allowed to sit by and disregard the rights of a patient. The Act requires hospitals to make some effort to initiate the process of surrogate decision making. I would reverse the circuit court order dismissing count I against Christ Hospital.