ANDREA A. COLLINS, Indiv. and as Special Adm'r of the Estate of Joseph J. Collins, Jr., Deceased, *et al.*, Plaintiffs-Appellants, v. LAKE FOREST HOSPITAL *et al.*, Defendants-Appellees.

Second District No. 2—02—1038

Opinion filed October 10, 2003.

Lawrence J. Griffin, of Eugene L. Griffin & Associates, Ltd., of Chicago, for appellants.

Marc F. Benjoya, John R. Reid, Donald F. Ivansek, and Brian A. Schroeder, all of Cassiday, Schade & Gloor, of Waukegan, for appellee Lake Forest Hospital.

James A. Christman and Nicole Nocera, both of Wildman, Harrold, Allen & Dixon, of Chicago, for appellee Gerald Osher.

JUSTICE BOWMAN delivered the opinion of the court:

Plaintiffs, Andrea A. Collins, individually and as special administrator of the estate of Joseph J. Collins, Jr., deceased, Jennifer R. Collins, Joseph J. Collins III, John M. Collins, and James S. Collins, appeal the dismissal with prejudice of counts III and VI of their amended complaint against defendants, Lake Forest Hospital (Hospital) and

Gerald Osher, M.D. The trial court dismissed counts III and VI, which alleged violations of the Health Care Surrogate Act (Act) (755 ILCS 40/1 *et seq.* (West 2000)), on the ground that plaintiffs were required to file with their complaint a certificate of merit pursuant to section 2—622 of the Code of Civil Procedure (Code) (735 ILCS 5/2—622 (West 2000)) and failed to do so. Plaintiffs argue on appeal that claims alleging violations of the Act do not require compliance with section 2—622 or, alternatively, that the trial court abused its discretion in dismissing their claims with prejudice and denying them an opportunity to procure a certificate of merit.

Plaintiffs filed their original complaint against the Hospital on April 19, 2001. Dr. Osher was named as a respondent in discovery. The complaint contained six counts. The first three counts were brought on behalf of the estate of the decedent, Joseph Collins, Jr. (Joseph) and alleged, respectively, wrongful death as a result of battery, negligence, and violations of the Act. The next three counts asserted the same theories on behalf of Joseph's wife, Andrea, and the couple's children. Following the Hospital's motions to dismiss pursuant to sections 2—615 (735 ILCS 5/2—615 (West 2000)) and 2—619 (735 ILCS 5/2—619 (West 2000)) of the Code, the trial court dismissed the negligence counts against the Hospital without prejudice for failure to comply with section 2—622. The court subsequently granted plaintiffs leave to file an amended complaint and to convert Dr. Osher from a respondent in discovery into a defendant.

Plaintiffs' amended complaint alleges that, on April 20, 1999, Joseph presented to the Hospital emergency room with acute subdural hematomas caused by a fall. Andrea consented on his behalf to an emergency craniotomy procedure. Following the procedure, "physicians and nurses of [the Hospital]" informed Andrea that Joseph's chance for survival was poor and that it would be prudent to remove him from the ventilator. Plaintiffs further allege that, at the time of his admission and at all subsequent times until his death, Joseph was unconscious, lacked any decisional capacity, was unable to give consent for any medical decisions, and had a qualifying condition as defined by the Act.

In addition, plaintiffs allege that Andrea informed the physicians and nurses that Joseph was not to be removed from the ventilator before their children arrived home from college on April 23 and had a chance to see Joseph. According to the amended complaint, on the morning of April 23, Andrea telephoned the hospital and informed a "nursing agent" that she and her children would come to the Hospital later that morning and that Joseph was to be kept on the ventilator so they could visit him. Plaintiffs further allege that, at 10:55 a.m., an

unidentified agent of one of the defendants, acting without Andrea's authority or permission, ordered that Joseph be removed from the ventilator. Joseph was disconnected from the ventilator at about 11 a.m. and died approximately three minutes later. Andrea and her children arrived at the hospital at approximately 11:10 a.m. and were informed that Joseph had been removed from the ventilator and had died shortly thereafter.

Counts I through III of the amended complaint are directed against the Hospital and assert theories of wrongful death as a result of battery, negligence, and violations of the Act, respectively. Counts IV through VI assert the same theories against Dr. Osher. Counts VII and VIII allege negligent lack of informed consent against the Hospital and Dr. Osher, respectively. Counts IX and X are also based on violations of the Act.

Pursuant to section 2—619 of the Code, Dr. Osher moved to dismiss all counts against him, except for the battery count, for failure to comply with section 2—622. The Hospital moved to dismiss the negligence and negligent lack of informed consent counts on the same ground.

The trial court granted defendants' motions, thereby dismissing with prejudice counts II, V, VI, VII, and VIII for failure to file a section 2—622 certificate of merit. In addition, plaintiffs conceded the dismissal of counts IX and X as duplicative of counts III and VI, the other counts alleging violations of the Act. After the court dismissed the count against Dr. Osher alleging violations of the Act, the Hospital sought dismissal of the similar count against it. The trial court granted the Hospital's motion and dismissed count III with prejudice as well. Plaintiffs filed a timely notice of appeal.

Plaintiffs contend on appeal that section 2—622 does not apply to counts III and VI of their amended complaint because those counts do not allege medical malpractice. Rather, plaintiffs argue that the question raised by these counts is whether defendants violated the Act by failing to consult with Andrea before removing Joseph from the ventilator.

■ When reviewing the dismissal of a cause of action pursuant to section 2—619, we take as true all well-pleaded facts alleged in the complaint. *Chadwick v. Al-Basha*, 295 Ill. App. 3d 75, 79 (1998). Consequently, we are concerned solely with a question of law presented by the pleadings and employ a *de novo* standard of review. *Chadwick*, 295 Ill. App. 3d at 79.

■ ■ Section 2—622(a) of the Code requires a plaintiff's attorney to file an affidavit and a reviewing health professional's report in any action in which "the plaintiff seeks damages for injuries or death by

reason of medical, hospital, or other healing art malpractice." 735 ILCS 5/2—622(a) (West 2000). Thus, when determining whether section 2—622 applies to plaintiffs' claims, we must decide whether, taking plaintiffs' allegations as true, the damages they seek were caused by defendants' "malpractice." See *Chadwick*, 295 Ill. App. 3d at 79. "Malpractice" is defined as:

> " 'Professional misconduct or unreasonable lack of skill. \*\*\* Failure of one rendering professional services to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the profession with the result of injury, loss or damage to the recipient of those services or to those entitled to rely upon them.' " *Cohen v. Smith*, 269 Ill. App. 3d 1087, 1090 (1995), quoting Black's Law Dictionary 959 (6th ed. 1990).

It is the nature of the plaintiff's claim, rather than any defense a defendant may raise, that determines whether the complaint sounds in malpractice. *Cohen*, 269 Ill. App. 3d at 1093.

The issue of whether a claim alleging violations of the Act requires compliance with section 2—622 is one of first impression. Plaintiffs here allege that defendants violated section 25 of the Act, which provides as follows, in pertinent part:

> "When a patient lacks decisional capacity, the health care provider must make a reasonable inquiry as to the availability and authority of a health care agent under the Powers of Attorney for Health Care Law. When no health care agent is authorized and available, the health care provider must make a reasonable inquiry as to the availability of possible surrogates listed in items (1) through (4) of this subsection." 755 ILCS 40/25 (West 2000).

The Act defines "decisional capacity" as "the ability to understand and appreciate the nature and consequences of a decision regarding medical treatment or forgoing life-sustaining treatment and the ability to reach and communicate an informed decision in the matter as determined by the attending physician." 755 ILCS 40/10 (West 2000). Section 20(c) of the Act provides that a determination that an adult patient lacks decisional capacity shall be made by the attending physician to a reasonable degree of medical certainty. 755 ILCS 40/20(c) (West 2000). Section 20 further requires the attending physician to document such a finding in the patient's medical record along with the physician's opinion as to the cause, nature, and duration of the lack of decisional capacity. 755 ILCS 40/20 (West 2000).

Defendants assert that, based on the definition of "decisional capacity" and the requirement that the attending physician determine to a reasonable degree of medical certainty that a patient lacks decisional capacity, the question of whether they complied with the

Act necessarily implicates their medical judgment. They further contend that a claim sounds in malpractice if it involves conduct that required medical and professional judgment.

We are guided in our analysis by *Chadwick v. Al-Basha*, 295 Ill. App. 3d 75 (1998), a case that neither party cites. The plaintiff in *Chadwick* alleged injuries resulting from the defendant psychiatrist's violations of sections 2—108 and 2—109 of the Mental Health and Developmental Disabilities Code (405 ILCS 5/2—108, 2—109 (West 1996)), which require that all restraint and seclusion orders be in writing. The plaintiff alleged that, as a result of these statutory violations, she was unlawfully restrained and secluded while a patient at the Singer Mental Health and Developmental Center. *Chadwick*, 295 Ill. App. 3d at 78.

Like defendants in the case at bar, the defendant in *Chadwick* contended that the plaintiff was required to comply with section 2—622 because her allegations challenged the defendant's exercise of professional skill or judgment (*Chadwick*, 295 Ill. App. 3d at 80). This court rejected the defendant's argument because the plaintiff's complaint stemmed from the defendant's alleged statutory violations rather than any breach of the standard of medical care. *Chadwick*, 295 Ill. App. 3d at 80. We further explained that the defendant's medical judgment was not implicated because "he was obligated to observe the specific requirements codified by the legislature as to the appropriate manner and use of restraints and seclusion as medical treatments." *Chadwick*, 295 Ill. App. 3d at 81.

Likewise, defendants here were obligated to follow the statutory directive to inquire as to a surrogate decision maker once the decision was made that the patient lacked decisional capacity. We agree that whether a patient has decisional capacity involves medical judgment. However, plaintiffs in the case at bar are not alleging that Joseph in fact had the capacity to make and communicate informed decisions regarding his medical care. Instead, they allege that Joseph was unconscious at all times during his hospital stay and that he lacked decisional capacity. Dr. Osher argues that he may raise as a defense that Joseph did have decisional capacity, thereby making the existence of decisional capacity a central issue in the case. As we stated earlier, the nature of any defense that might arise is irrelevant to the determination of whether a complaint sounds in malpractice for purposes of section 2—622.

Dr. Osher likens the case at bar to *Kus v. Sherman Hospital*, 204 Ill. App. 3d 66 (1990), and *Kolanowski v. Illinois Valley Community Hospital*, 188 Ill. App. 3d 821 (1989). In *Kus*, the court held that the plaintiff's claim that a doctor improperly treated him with an

experimental device that had lost government approval was predicated upon healing art malpractice. *Kus*, 204 Ill. App. 3d at 72. Likewise, the court in *Kolanowski* held that the plaintiff was required to file a section 2—622 certificate of merit when he alleged that the defendant hospital failed to adequately supervise and restrain him, resulting in his injuries when he fell out of a bed. *Kolanowski*, 188 Ill. App. 3d at 825.

■ As we explained in *Chadwick*, *Kus* and *Kolanowski* are distinguishable from situations in which a defendant health care provider is statutorily obligated to perform the task at issue in a prescribed manner. Contrary to *Kus* and *Kolanowski* and similar to *Chadwick*, plaintiffs in the case at bar do not allege that defendants "improperly exercised [their] professional skill" (*Chadwick*, 295 Ill. App. 3d at 81), but rather that they failed to follow the procedures set forth by statute. Accordingly, we hold that plaintiffs are not required to comply with section 2—622, and the trial court erred in dismissing counts III and VI of their amended complaint. In light of our determination of this issue, we need not address whether the trial court acted improperly in denying plaintiffs an opportunity to obtain a section 2—622 certificate of merit.

■ In addition to its arguments based on section 2—622, the Hospital also asserts that dismissal of plaintiffs' claims against it was appropriate because it owed plaintiffs no duty under the Act. We note that the Hospital did not raise this issue in the trial court. It is well settled that issues not raised in the trial court are generally deemed waived and may not be raised for the first time on appeal. *Central Illinois Public Service Co. v. Allianz Underwriters Insurance Co.*, 244 Ill. App. 3d 709, 720 (1993). The reasoning underlying this rule is that the appellate court should not consider different theories or new questions on appeal if proof might have been offered to refute or overcome them had they been presented below. *Central Illinois*, 244 Ill. App. 3d at 720. This is true even of legal issues (*Sasser v. Alfred Benesch & Co.*, 216 Ill. App. 3d 445 (1991)), such as whether a duty exists. Waiver, however, is an admonition to the parties, not a limitation on the reviewing court's jurisdiction. *Texaco-Cities Service Pipeline Co. v. McGaw*, 182 Ill. 2d 262, 279 (1998). A reviewing court may relax the waiver rule in order to maintain a uniform body of precedent or where the interests of justice so require. *Texaco-Cities*, 182 Ill. 2d at 279. Accordingly, we choose to address the duty issue in spite of waiver because it is likely to recur on remand.

According to section 25(a) of the Act, a health care provider must make a reasonable inquiry as to the availability and authority of a surrogate "[w]hen a patient lacks decisional capacity." 755 ILCS 40/

25(a) (West 2000). There is no dispute that the Hospital meets the definition of a "health care provider" under the Act.

■ As always, in interpreting a statute we must give effect to the legislature's intention. *Varelis v. Northwestern Memorial Hospital*, 167 Ill. 2d 449, 454 (1995). The language of the statute is the best indicator of legislative intent. *Kirwan v. Welch*, 133 Ill. 2d 163, 165 (1989). Consequently, we look first to the words of the statute. *Metropolitan Life Insurance Co. v. Washburn*, 112 Ill. 2d 486, 492 (1986). When such language is clear, we do not resort to other tools of construction. *Henry v. St. John's Hospital*, 138 Ill. 2d 533, 541 (1990).

■ Relying on *Ficke v. Evangelical Health Systems*, 285 Ill. App. 3d 886 (1996), the Hospital contends that its duty under the Act is triggered only by a written finding by the patient's attending physician that the patient lacks decisional capacity. Because there was no such written finding in this case, the Hospital asserts that it had no duty to inquire as to the availability of a surrogate. We disagree with the Hospital's interpretation of the Act and find *Ficke* distinguishable.

The plain language of the Act indicates that the existence of a duty under section 25 of the Act is not dependent upon a written finding of decisional capacity. The Act defines "decisional capacity" as "the ability to understand and appreciate the nature and consequences of a decision regarding medical treatment or forgoing life-sustaining treatment and the ability to reach and communicate an informed decision in the matter as determined by the attending physician." 755 ILCS 40/10 (West 2000). Although section 20 of the Act requires the attending physician to document a finding of lack of decisional capacity in the patient's medical record, section 25 states that a health care provider must make reasonable inquiry when a patient "lacks decisional capacity," not when a physician has made a written finding that a patient lacks decisional capacity. We believe that if the legislature had intended for a duty under section 25 to arise only upon a written finding of decisional incapacity, it would have expressly said so.

We recognize that the court in *Ficke* reached the opposite result. In *Ficke*, the court held that "there is no duty on the part of the hospital to inquire into the availability of a surrogate until a finding has been made by the attending physician that the patient lacks decisional capacity and has a qualifying condition." *Ficke*, 285 Ill. App. 3d at 893-94. The court based its holding on the following: (1) section 20(c)'s requirement that a physician diagnose lack of decisional capacity to a reasonable degree of medical certainty (755 ILCS 40/20(c) (West 1992)); (2) section 20(e)'s requirement that the attending physician document in writing the existence of a qualifying condition (755

ILCS 40/20(e) (West 1992)); and (3) the presumption codified in section 20(c) that a patient "is presumed to have decisional capacity in the absence of actual notice to the contrary without regard to advanced age" (755 ILCS 40/20(c) (West 1992)). Thus, the court held that "it is for the attending physician, not the hospital or its staff, to determine whether the Act applies to a particular patient." *Ficke*, 285 Ill. App. 3d at 893.

*Ficke* is distinguishable from the case at bar for two reasons. First, section 25 has been amended since *Ficke*. The version of section 25 at issue in *Ficke* required a health care provider to make a reasonable inquiry as to the availability of a surrogate when "a patient has a qualifying condition and lacks decisional capacity" (755 ILCS 40/25(a) (West 1992)). *Ficke*, 285 Ill. App. 3d at 893. The court in *Ficke* based its decision in part on the fact that the Act required a physician to diagnose and document both lack of decisional capacity and the presence of a qualifying condition under the Act. *Ficke*, 285 Ill. App. 3d at 893. The legislature subsequently amended section 25(a), removing the requirement that a patient have a qualifying condition. Pub. Act 90—246, § 10, eff. January 1, 1998. Because *Ficke* does not interpret the version of the statute before us, we decline to rely on it.

Moreover, we disagree with the court's reasoning in *Ficke*. While we agree with the statement that, pursuant to the language of the Act, the determination of whether a patient has decisional capacity is for an attending physician to make, we take issue with the court's implied holding that written certification in a medical record is the only way a hospital could have actual notice of a patient's lack of decisional capacity. As the dissenting justice in *Ficke* remarked, "the hospital has sufficient knowledge of the condition of its patients to determine whether it is probable that a surrogate decision maker is needed. Nurses monitor the patient's condition, and physicians and nurses make notes in the patient's medical record." *Ficke*, 285 Ill. App. 3d at 897 (Cerda, J., dissenting). We would add that a hospital, through its nursing and other staff, is intimately involved in a patient's care. It is unrealistic to suggest that nurses or other hospital employees acquire actual notice of a patient's inability to make decisions related to his or her care only when a physician has made a written note in the medical record.

Further, such a holding would lead to an unjust and unintended result when a physician has made the requisite finding and the hospital has notice of the patient's lack of decisional capacity, but the physician inadvertently fails to put his finding in writing in the patient's record. We find such a result especially troubling when, as in this case, we are dealing with a decision to terminate life-sustaining

treatment. We note that *Ficke* involved allegations that a hospital continued life-sustaining treatment against the surrogate's wishes, rather than terminated such treatment. We find this to be another significant distinction between the instant case and *Ficke*. Accordingly, we conclude that the lack of a written finding by the attending physician did not absolve the Hospital of its duty under the Act to make a reasonable inquiry as to the availability and authority of a surrogate to make decisions with respect to Joseph's medical care.

For the foregoing reasons, we reverse the judgment of the circuit court of Lake County and remand the cause for further proceedings consistent with this disposition.

Reversed and remanded.

HUTCHINSON, P.J., and BYRNE, J., concur.