# In the

# United States Court of Appeals

## For the Seventh Circuit

—————

No. 02-1873

ESTATE OF DARLENE ALLEN,

*Plaintiff-Appellant,*

*v.*

CITY OF ROCKFORD, a Municipal Corporation of
the State of Illinois, CHERYL TAYLOR and BRUCE
SCOTT, individually and in their official capacities
as police officers for the City of Rockford, et al.,

*Defendants-Appellees.*

—————

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 99 C 50324—**Philip G. Reinhard**, *Judge.*

—————

ARGUED JANUARY 24, 2003—DECIDED NOVEMBER 20, 2003

—————

Before RIPPLE, EVANS, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* After she was placed under arrest for driving under the influence of drugs, Darlene Allen was driven to Rockford Memorial Hospital by a police officer for the purpose of obtaining a urine sample. Allen refused to provide a urine sample and to consent to a drug screening test requested by the emergency room doctor. After deeming Allen not competent, the doctor, without the

assistance of the arresting officer, forcibly extracted blood and urine samples from Allen. Allen sued the City of Rockford and several police officers under 42 U.S.C. § 1983 for alleged due process violations stemming from the unwanted medical treatment, and also filed various state law claims against the City, the officers, and numerous hospital personnel. The district court granted summary judgment to the City and police officers on Allen's § 1983 claims, denied Allen's cross-motions for partial summary judgment, and declined to exercise supplemental jurisdiction over the state law claims. Allen appeals both the grant of summary judgment in the officers' favor and the denial of partial summary judgment in her favor. Because Allen has not established that the officers either breached a duty of care or placed her in a dangerous situation by not preventing her forced treatment, we affirm the district court's ruling.

## I.  BACKGROUND

On July 6, 1999, Rockford police officer Kevin Nordberg received information that a car matching the description of Darlene Allen's had been traveling on the wrong side of the road. Nordberg pulled over Allen in a parking lot for a local tavern. He observed that Allen was shaking violently, and had slurred speech and glassy eyes. Allen attributed her behavior to prescription medication. After eliciting statements from Allen about the condition of her car (the front passenger's side was damaged and the front bumper was missing) and confirming those statements, Nordberg believed that Allen had fled the scene of a property damage accident,[1] and placed her under arrest. He also suspected that Allen was driving under the influence, and called

---

[1] Other police officers found Allen's front bumper and a fallen tree at the location Allen described.

D.U.I. Task Force Officer Cheryl Taylor to the scene to help assess Allen's condition. Taylor observed the same abnormal behavior that concerned Nordberg and also noticed that Allen had difficulty walking unassisted. Allen admitted taking a drug called Soma, which had been prescribed to her sister, and was arrested for driving under the influence of drugs.

Taylor drove Allen to Rockford Memorial Hospital, where Allen refused to provide a urine sample in connection with her alleged D.U.I. violation. Taylor told Dr. Arthur F. Proust, the board-certified emergency room doctor, that Allen had been driving northbound in a southbound lane and had been in an accident. She also told him that Allen had passed a Breathalyzer test. Dr. Proust observed that Allen's speech was slurred, that she was intermittently sleepy and alert, and that she had borderline low blood pressure. He also noticed that there were only seven pills remaining in the bottle of Soma. (Dr. Proust claims that if the Soma had been taken at the prescribed dosage, there should have been sixteen pills left.) Allen was disoriented with respect to the time of year, stating that it was January instead of July. According to Dr. Proust, he became concerned that Allen may have overdosed on the Soma, with potentially fatal consequences, and may have ingested other drugs as well that would have exacerbated the effects of the Soma. Allen refused to consent to a drug screen. Upon determining that Allen's altered state rendered her incompetent to make decisions about her medical treatment, Dr. Proust told Taylor that he planned to extract blood and urine samples from Allen to determine the type and amount of drugs she had ingested.[2] Additionally, hospital staff told

---

[2] Allen insists that Dr. Proust did not believe that an emergency existed when he extracted the samples. The basis for Allen's assertion is unclear, as Dr. Proust's deposition reflects that although

(continued...)

Taylor that they were concerned about potential liability if they allowed Allen to leave the hospital and she overdosed.

Taylor told Dr. Proust that Allen had refused to consent to any testing relating to her alleged D.U.I. violation. Taylor then apprised her supervisor, Sergeant Bruce Scott, of the situation. Neither Taylor nor Scott have any medical training beyond CPR and basic first aid. Scott told Taylor that the hospital was acting of its own accord, and that it was up to the doctor to act as he thought necessary to prevent Allen from having a potentially life-threatening drug overdose. Taylor then informed the hospital that she would have no role in Allen's medical treatment. With the assistance of hospital staff, Dr. Proust then forcibly extracted the blood and urine samples from Allen.[3] There were no police officers in the room at that time. Tests revealed that Allen had taken other drugs in addition to Soma, such as benzodiazepines, marijuana, and opiates. (Allen acknowledged in her deposition that she was taking Soma, Vicodin, Prozac, and Activan as of July 5, 1999, the day before her arrest.) Allen was given counteracting agents designed to prevent drug overdoses[4] and was released back into police custody.

---

[2]  (...continued)
he felt that there was no immediate need to provide Allen with drugs to counteract a potential overdose, there was an immediate need to test Allen to determine what she had taken. In any event, this factual dispute is not relevant to the claims at issue here, which revolve around whether the officers, not Dr. Proust, were under the impression that an emergency existed. At oral argument, Allen conceded that no statement was ever made to the officers that there was not an immediate need to intervene.

[3]  Two security guards filed battery claims against Allen alleging that she attacked them during the drug screen.

[4]  Dr. Proust could not remember whether Allen received the counteracting drugs before or after the samples were extracted.

Allen filed a 42 U.S.C. § 1983 suit against the City of Rockford, Taylor, and Scott[5] alleging Fourteenth Amendment due process violations stemming from Taylor and Scott's failure to prevent the hospital staff from extracting the samples. Allen also filed various state law claims, including battery, intentional infliction of emotional distress, and malicious prosecution, against Rockford Health Systems, Inc. d/b/a Rockford Memorial Hospital, Dr. Proust, other hospital personnel, the City, and the officers. The defendants sought summary judgment on all claims, while Allen filed various cross-motions for partial summary judgment.

In a well-reasoned opinion, the district court granted summary judgment to the City and the police officers on Allen's § 1983 claims, denied Allen's partial summary judgment motion on those claims, declined to exercise supplemental jurisdiction over the state law claims, and denied as moot all parties' summary judgment motions on the state law claims. Allen appeals the grant of summary judgment in favor of the police officers in their individual capacities, but does not appear to challenge the grant of summary judgment to the City. She also contests the denial of her motion for partial summary judgment.[6]

## II. ANALYSIS

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex*

---

[5] Taylor and Scott were sued in both their official and individual capacities.

[6] Allen died during the course of briefing the summary judgment motions. Jim Moriarty, as Special Administrator of the Estate of Darlene Allen, was substituted as the named plaintiff.

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986). We review grants of summary judgment de novo, viewing all facts in the light most favorable to the non-moving party. *Rizzo v. Sheahan*, 266 F.3d 705, 711 (7th Cir. 2001). However, our analysis is complicated by the fact that Taylor and Scott have raised the defense of qualified immunity. Allen bears the burden of defeating this defense. *See Sparing v. Vill. of Olympia Fields*, 266 F.3d 684, 688 (7th Cir. 2001). Thus, we assess whether, viewing all of the facts in Allen's favor, the officers violated one of Allen's constitutional rights. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). Even if this requirement is satisfied, in order to prevail Allen must also show that the constitutional right was clearly established such that a reasonable officer would have understood that she was violating that right. *Id.* at 201-02.

A.   The § 1983 Claim

The Supreme Court made clear in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989) that the Fourteenth Amendment's Due Process Clause does not impose a general, affirmative obligation upon the state to protect its citizens against the deprivation of life, liberty, and property by private actors. *Id.* at 195. However, the courts have acknowledged that this rule is subject to two narrow exceptions.

Specifically, "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon [the State] a corresponding duty to assume some responsibility for [the person's] safety and general well-being," in light of the special relationship between the state and that individual. *Id.* at 199-200; *see also Kitzman-Kelly v. Warner*, 203 F.3d 454, 458 (7th Cir. 2000) (explaining that the special relationship arises "from the limitations that the state has imposed upon [an individual]

through a restraint on his personal liberty"); *Collignon v. Milwaukee County*, 163 F.3d 982, 987 (7th Cir. 1998) (stating that "[w]hen a state actor . . . deprives a person of his ability to care for himself by incarcerating him, detaining him, or involuntarily committing him, it assumes an obligation to provide some minimum level of well-being and safety"). The state's failure to meet this duty of care constitutes a violation of the Due Process Clause of the Fourteenth Amendment. *DeShaney*, 489 U.S. at 200. Additionally, the state may be held liable for due process violations if it places an individual in a position of danger that she would not otherwise have faced. *See Monfils v. Taylor*, 165 F.3d 511, 516 (7th Cir. 1998); *Collignon*, 163 F.3d at 987; *Estate of Stevens v. City of Green Bay*, 105 F.3d 1169, 1174 (7th Cir. 1997). Allen contends that because she was subjected to forced medical treatment while she was a pretrial detainee, Taylor and Scott are liable for due process violations under both the "special relationship" and "state-created danger" exceptions.

### 1.   The "Special Relationship" Exception

The officers contend that no special relationship was established because Allen was neither incarcerated nor institutionalized when she received the forced treatment. Although in *Estate of Stevens v. City of Green Bay*, 105 F.3d 1169 (7th Cir. 1997), we questioned whether the "special relationship" exception applies to simple criminal arrests, in that case we were analyzing whether a special relationship arises merely because "a person rid[es] in the back seat of an unlocked police car for a few minutes." *Id.* at 1175. We have since made clear that *DeShaney*'s exceptions apply to pretrial detainees, *see Tesch v. County of Green Lake*, 157 F.3d 465, 472-73 (7th Cir. 1998); *see also Collins v. City of Harker Heights*, 503 U.S. 115, 127-28 (1992) (explaining that the Due Process Clause "requires that conditions of confinement satisfy certain minimum standards for pretrial

detainees, for people in mental institutions, for convicted felons, and for persons under arrest") (citations omitted), and the officers themselves asserted that Allen was a pretrial detainee. *See Estate of Allen v. City of Rockford*, No. 99 C 50324, 2002 WL 426117, at *4 (N.D.Ill. Mar. 15, 2002) ("All parties (and the court) agree Allen should be considered a pretrial detainee while she was at the Hospital. . . ."). We therefore agree with Allen that she was entitled to a certain level of care and safety.

However, the facts do not support Allen's contention that the officers were aware of a substantial risk of injury to Allen in the form of a battery (*i.e.*, the forced medical treatment), failed to prevent this known danger, and therefore failed to meet their duty of care. Rather, the evidence suggests that it is precisely because the officers did *not* intervene with the medical treatment that the officers met their obligations to Allen.

Taylor and Scott were met with the following scenario: Allen had slurred speech, glassy eyes, and mobility problems, but had passed a Breathalyzer test. A licensed emergency care physician had stated that Allen was not competent to make decisions regarding her health, and might suffer a potentially life-threatening drug overdose if a drug screen was not conducted. We need not consider whether Dr. Proust's assessment of Allen's competency or lack thereof was correct.[7] The crux of the matter is that the officers, who had no training beyond CPR and first aid, quite

---

[7] Allen contends that the district court decided that she was incompetent despite her assertions to the contrary, in violation of summary judgment standards. She does not point to any language in the district court's opinion to support her claims, nor have we found any. The district court simply addressed the issue of whether it was proper for the officers to defer to the physician's determination of incompetence, and we adopt the same approach on appeal.

reasonably chose not to question a licensed physician's determinations that treatment was necessary and that Allen was not competent to decide otherwise. *Cf. Brownell v. Figel*, 950 F.2d 1285, 1291 (7th Cir. 1991) (explaining that it would be "unrealistic" to expect police officers to second-guess a physician's medical diagnosis). Indeed, had Taylor and Scott prevented the treatment and Allen had suffered negative health consequences as a result, they would have left themselves open to charges of due process violations for failure to provide appropriate medical care to a pretrial detainee. *See Chapman v. Keltner*, 241 F.3d 842, 845-46 (7th Cir. 2001).

Allen's next argument is that the officers did not provide the appropriate standard of care because they failed to protect her liberty interest in preventing unwanted treatment. We do not quibble with her assertion that the Supreme Court in *Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261 (1990) found a "constitutionally protected liberty interest in refusing unwanted medical treatment." *Id.* at 278; *see also Washington v. Harper*, 494 U.S. 210, 221 (1990) (finding a "significant liberty interest in avoiding the unwanted administration of antipsychotic drugs").

However, Allen's contention appears to rest on the hypothesis that she has a constitutional right to state protection from unwanted medical treatment after a physician has determined that treatment is required and found her incompetent to make decisions about her medical treatment. *Cruzan* does not address Allen's circumstances. Rather, the *Cruzan* Court stated that "[t]he principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions," *id.* at 278, but "[a]n incompetent person is not able to make an informed and voluntary choice to exercise a hypothetical right to refuse

treatment or any other right." *Id.* at 280. Conspicuously absent from the *Cruzan* opinion is any language suggesting that state actors who are not physicians must prevent unwanted medical treatment notwithstanding a doctor's determination that the person refusing treatment is incompetent.

Undaunted, Allen points to *Sheik-Abdi v. McClellan*, 37 F.3d 1240 (7th Cir. 1994), for the proposition that § 1983 liability attaches to Taylor and Scott. *Sheik-Abdi*, however, is irrelevant to our analysis. In that case, after pointing out that the plaintiff did not allege that he received any medical treatment, we stated the following:

> Accordingly, even if the rationales of *Cruzan v. Director of Missouri Health Department*, 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) (stating that a competent person has a liberty interest under the Due Process Clause in refusing unwanted medical treatment that must be balanced against relevant state interests and assuming, for purposes of that case, that the Constitution would grant a competent person a protected right to refuse lifesaving hydration and nutrition), and *Washington v. Harper*, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (establishing a right to a due process hearing before an inmate can be administered psychotropic drugs), could be extended to the circumstances presented here, the fact that no forced treatment is alleged to have actually taken place frees Akers from any potential § 1983 liability.

*Id.* at 1248-49. This quotation makes clear that in *Sheik-Abdi*, we merely discussed hypotheticals; we neither held that *Cruzan* applied to Sheik-Abdi's circumstances nor paved the way for *Cruzan*'s application to the instant case. We therefore see no support for Allen's contention that the

officers' inaction can be characterized as a constitutional violation under the "special relationship" exception, and find that the district court properly granted summary judgment to the officers on that issue.[8]

### 2. The "State-Created Danger" Exception

Allen's assertion that her situation falls within *DeShaney*'s "state-created danger" exception is similarly without merit. Allen admits that there can be no suggestion that "the police action of removing her from the road was unwise or form[s] the basis for liability." Indeed, it would be difficult to argue otherwise, as Allen had just been in a traffic accident and was seen driving in the direction of oncoming traffic. However, Allen contends that by taking

---

[8] Citing the Health Care Surrogate Act, 755 ILL. COMP. STAT. 40/1 *et seq.* ("the Act") and various cases, Allen also contends that she has a liberty interest in refusing unwanted treatment under Illinois law. *See Thielman v. Leean*, 282 F.3d 478, 480 (7th Cir. 2002) ("Liberty interests can arise from two sources: The Federal Constitution or state law."). But even assuming that Illinois recognizes such an interest, this interest is generally analyzed with a presumption that the individual is competent to refuse treatment, and thus appears to be no broader than the liberty interest found in *Cruzan. See, e.g., Prairie v. Univ. of Chicago Hosps.*, 698 N.E.2d 611, 619 (Ill. App. Ct. 1998); *In re Baby Boy Doe*, 632 N.E.2d 326, 330 (Ill. App. Ct. 1994). Moreover, Allen's reliance on the Act, which requires a health care provider to find a surrogate decision-maker in certain cases, is misplaced. The Illinois courts have not suggested that police officers, as opposed to physicians or other hospital staff, must determine whether the Act is relevant to a particular patient. *See, e.g., Ficke v. Egangelical Health Sys.*, 674 N.E.2d 888, 893 (Ill. App. Ct. 1996). Finally, Allen herself argues that a surrogate would not be necessary in an emergency, and we have already noted that she has not put forth persuasive evidence that the officers did not believe that an emergency existed. We therefore fail to see how Allen can make out a constitutional violation based on state law.

her to the hospital and "abandoning" her to unwanted treatment, the police "placed her in danger from an imminent battery which the police knew was about to occur."

Although we acknowledged in *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982) that the state's placement of an individual in harm's way can result in actionable constitutional claims, cases in which we have either found or suggested that liability attaches under the "state-created danger" exception are rare and often egregious. For example, in *Monfils v. Taylor*, 165 F.3d 511 (7th Cir. 1998), we upheld a jury verdict against a police officer who allowed an informant's tape to be released despite his knowledge that the tape's release would result in heightened danger to the informant, who was ultimately killed. *Id.* at 520. In *Reed v. Gardner*, 986 F.2d 1122 (7th Cir. 1993), which involved death and serious injury due to a car crash, we stated that "[p]olice officers who remove sober drivers and leave behind drunk passengers with keys may be said to create a danger or at least render others on the road more vulnerable." *Id.* at 1125. Additionally, in *White v. Rochford*, 592 F.2d 381 (7th Cir. 1979), a pre-*DeShaney* case, we required a trial when officers, after arresting the children's uncle, left three children in an abandoned car on the side of the road such that the children had to cross eight lanes of traffic and brave the elements in search of a phone, resulting in the week-long hospitalization of a five-year-old child. *Id.* at 382.

Here, the officers attempted to *minimize* danger by allowing a licensed physician to exercise his judgment rather than substituting their own judgment. We are unwilling to place the officers' actions in this case on the same footing as *Monfils*, *Reed*, and *White*, and decline to find a due process violation under these circumstances.[9]

---

[9] Allen's brief does not appear to challenge the district court's grant of summary judgment to the City and the officers in their
(continued...)

## B. The Denial of Partial Summary Judgment

Finally, Allen argues that the district court improperly denied her motion for partial summary judgment based on the Health Care Surrogate Act, 755 ILL. COMP. STAT. 40/1 *et seq.* Although Allen does not articulate which denial she is appealing (the district court denied both her partial summary judgment motion on her federal claims and her partial summary judgment motion on her state law claims), we assume that she is contesting the district court's denial of partial summary judgment on her state law claims as moot. We need not address the defendants' substantive arguments that summary judgment is unwarranted. We have already ruled that the district court properly denied summary judgment on Allen's federal claims, and we therefore find no fault with its decision to deny the state law-based motions as moot and dismiss the state law claims. Moreover, Allen's argument on appeal is waived, as it consists of a page-long citation to the Act, followed by three unilluminating sentences. *See Tyler v. Runyon*, 70 F.3d 458, 464-65 (7th Cir. 1995).

---

[9] (...continued)

official capacity. However, assuming that Allen intended her vague and sporadic references to departmental policy to be construed as an appeal of this issue, we consider the argument waived in light of her failure to discuss any of the requirements for municipal liability set forth in *Monell v. Department of Social Services*, 436 U.S. 658 (1978). *See Tyler v. Runyon*, 70 F.3d 458, 464-65 (7th Cir. 1995). In any event, the fact that Taylor and Scott are not liable on the underlying substantive claim provides an obvious basis for not holding the City liable. *See Treece v. Hochstetler*, 213 F.3d 360, 364 (7th Cir. 2000).

### III.  CONCLUSION

We in no way mean to make light of any discomfort or outrage Allen may have felt during the involuntary treatment, nor do we suggest that a police officer can *never* be held liable for failing to prevent medical personnel from treating a patient against her will. However, the specific circumstances at issue here simply do not give rise to a constitutional violation. We therefore AFFIRM the judgment of the district court.


A true Copy:

      Teste:


                  _____
                  *Clerk of the United States Court of*
                      *Appeals for the Seventh Circuit*