No. 2--04--1205                    Filed:  5/2/06

_____

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

_____

| | |
|---|---|
| In re ESTATE OF DARLENE ALLEN, Deceased | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| (Jim Moriarity, as Special Administrator of the Estate of Darlene Allen, Deceased, Plaintiff-Appellant, v. Rockford Health Systems, Inc., d/b/a Rockford Memorial Hospital; Arthur F. Proust; DeWayne Neal; Lorri J. Lee; Emil K. Mosny; and Valeri D. Smith, Indiv. and as Employees of Rockford Health Systems, Inc., Defendants-Appellees). | ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 03--L--69 Honorable Janet R. Holmgren, Judge, Presiding. |

_____

_____

JUSTICE KAPALA delivered the opinion of the court:

On July 6, 1999, defendant, Dr. Arthur F. Proust, in an attempt to determine the existence of a potentially fatal drug interaction or overdose, ordered the forcible extraction of urine and blood samples from his patient, Darlene Allen.  Allen died more than two years later while her suit against the City of Rockford and several police officers under section 1983 of the Civil Rights Act (42 U.S.C. §1983 (2000)) was pending in federal district court. Thereafter, Allen's estate, through its special administrator, plaintiff Jim Moriarity, sued defendants, Dr. Arthur F. Proust, Rockford Health Systems, Inc., d/b/a Rockford Memorial Hospital, DeWayne Neal, Lorri J. Lee, Emil K. Mosny, and Valeri D. Smith, in the circuit

court of Winnebago County, alleging medical battery. Plaintiff claims that defendants failed to obtain consent for the extraction either directly from Allen or indirectly from someone authorized to consent to the treatment for her. The circuit court granted defendants' motion for summary judgment. Plaintiff appeals. We reverse, because we find genuine issues of material fact precluding a holding that the common-law emergency exception to the informed consent rule, which is a defense to an action for medical battery, was applicable as a matter of law.

## I. BACKGROUND

After placing Allen under arrest for driving under the influence of drugs, a police officer drove her to Rockford Memorial Hospital, where she signed a consent form for treatment but did not consent to the drug screening test requested by Dr. Proust. After deeming Allen incompetent to consent, Dr. Proust ordered the forcible extraction of blood and urine, as well as the administration of drugs to counteract a possible overdose. After being treated by Dr. Proust, Allen was discharged into police custody. Allen subsequently filed a section 1983 action in United States District Court against the City of Rockford, Officer Taylor, and Officer Taylor's supervisor, as well as supplemental state-law tort claims against the City of Rockford, the police officers, and numerous hospital personnel. On September 12, 2001, while summary judgment briefing was pending in that case, Allen died, and thereafter plaintiff was substituted as the named plaintiff. The district court granted summary judgment in favor of the City of Rockford and the two police officers, and refused to exercise supplemental jurisdiction over the state-law claims against defendants. Estate of Allen v. City of Rockford, No. 99--C--50324 (N.D. Ill. 2002), aff'd, 349 F.3d 1015 (7th Cir. 2003). Plaintiff then filed a medical-battery claim against defendants in the circuit court of Winnebago County.

The complaint contained the following allegations. The police brought Allen to Rockford Memorial Hospital against her will, and defendants desired to take samples of Allen's blood and urine, "ostensibly to check her welfare, but actually motivated by the desire to assist the police." Allen refused the requests of Dr. Proust and the medical personnel to provide blood and urine samples. Employees of defendant Rockford Health Systems, by use of force and against Allen's will, obtained blood and urine samples. The actions of these employees constituted a battery. Dr. Proust ordered the employees to batter Allen and, therefore, was accountable and responsible.

In their motion for summary judgment, defendants took the position that the emergency exception to the requirement of informed consent to medical treatment was applicable. In support of their motion, defendants attached as exhibits a transcript of Dr. Proust's deposition testimony, Dr. Proust's dictated report of his treatment of Allen (Emergency Department Report), the emergency department record from July 6, 1999, and an excerpt from Allen's deposition. Dr. Proust testified to the following facts during his deposition.

He is board certified in emergency medicine and was on duty at the emergency department of Rockford Memorial Hospital from 9 p.m. July 5, 1999, to 6 a.m. July 6, 1999. Allen was brought to the emergency room at Rockford Memorial Hospital at an unknown time on July 6, 1999, by Officer Taylor of the Rockford police department. Allen signed a form indicating her consent to be treated. According to the patient's chart, Dr. Proust first saw Allen at 2:45 a.m. when he walked into a room where Allen was being verbally abusive to staff and was being restrained by security. Also present were Officer Taylor, a paramedic technician, a nurse, and a certified nurse aide. Dr. Proust had a conversation with the police officer, the nurses, and Allen, but not necessarily in that order. Officer Taylor indicated that Allen was driving her vehicle on a bike path when she struck a tree and left her bumper behind. Officer Taylor also told Dr. Proust that Allen was driving on the wrong side of the

road at about 5 miles per hour when she was pulled over by police. The Breathalyzer test administered to Allen in the field was negative. Officer Taylor told Dr. Proust that Allen had with her a bottle of medication called Soma, which was prescribed to Allen's sister. Later in his deposition, Dr. Proust explained that Soma is a muscle relaxant that causes central nervous system depression. Seven tablets of the original twenty tablets remained in the bottle. The prescription had been filled the previous day, and if the person for whom the pills were prescribed had been taking them as directed, nine tablets were unaccounted for.

The triage nurse's report that Dr. Proust read indicated that Allen's vital signs were stable, but that her blood pressure was borderline low. A triage note made at 1:15 a.m. indicated that Allen took two Soma at, she "thinks[,] 2300," that is 11 p.m. The triage notes also indicated that "[p]atient brought in by police--unable to ambulate straight and steady" and "[n]ot oriented to time and date." Allen was uncooperative and did not respond to Dr. Proust's questions, including why some of the Soma pills were missing. Allen was intermittently alert and sleepy, was intermittently aggressive with staff, and had slurred speech. As to his indication in the Emergency Department Report that Allen was oriented to person, time, and place, Dr. Proust said that he called out Allen's name and she responded, he asked her if she knew where she was and she said "Rockford Memorial Hospital," he asked her if she knew what the date was and she said it was "July 1999." Dr. Proust could not remember at what point during his evaluation of Allen he asked her those questions, but he indicated that Allen did not respond to those questions right away.

Based on Allen's slurred speech, uncooperativeness, and intermittent sleepiness and aggressiveness, Dr. Proust became concerned that Allen had ingested other drugs in addition to the Soma. Dr. Proust said, at first, defendant would not admit to taking anything other than two Soma. Dr. Proust testified, "I have to assume the worst when I see a patient and I see a pill bottle that

doesn't have all the medication it should have. And that's [sic] our job is to assume the worst and [to evaluate] what is the worst thing that could be happening with the patient, is it an overdose[?], is that a reason for impairment, et cetera[?], and to take or try to take proper action." Dr. Proust agreed that he indicated in the Emergency Department Report that the "[p]atient refused to cooperate with drug screen and alcohol level. She was advised that because of her impaired driving, as well as the fact that [there] were a number of missing Soma, as well as the possibility of other drug usage due to her somnolence and slurred speech, it was necessary to do a drug screen." After Dr. Proust explained to Allen that he needed to know what she had ingested in order to treat her properly, she refused to tell him. Dr. Proust explained to Allen that he needed a urine sample. Allen did not verbally refuse to give a urine sample but, rather, refused by attempting to get up and walk away. Allen could not balance and was unable to walk. Dr. Proust asked Allen why she was resisting, but Allen did not answer. Dr. Proust made the determination that Allen was not competent to refuse medical treatment. Dr. Proust explained that Allen was restrained because she was "delirious, intoxicated," and clawing, punching, kicking, and spitting at the staff, and could have hurt herself or a staff member. Dr. Proust gave the instruction to catheterize Allen to obtain a urine sample, to draw blood, and to administer the drugs Narcan and Actidose. These instructions were carried out by the emergency department nurses.

Dr. Proust was concerned with the possibility of Allen losing consciousness and losing control of her airway. As an example, Dr. Proust explained that if Allen took an overdose of tricyclic medication, she could suddenly lose consciousness, lose blood pressure, not control her airway, and possibly aspirate if she vomited. Dr. Proust said that if he did not test for it, and she had taken a tricyclic, even though he might be observing her, he might intervene too late. When asked if

his examination of Allen was indicative of a medical emergency requiring immediate intervention to prevent death or serious harm, to a reasonable degree of medical certainty, Dr. Proust said:

"The aspects of her evaluation were the lack of cooperation, the slurred speech, the intermittent wakefulness and sleepiness, the inability to either answer questions or refusing to answer questions, the unaccounted for missing Soma, the potential low blood pressure that I had initially, the fact that she was--the history I had of the officer's impression of driving impaired, northbound in a southbound lane, whatever the officer told me, you know, those aspects led me to believe that she could have potentially taken a serious overdose. And I needed to know if she did or not, which would help guide my treatment.

If, for example, she was depressed and took an overdose of an antidepressant, that may initially allow someone to present like this; but later on they can become unconscious or obtunded.

And if I missed that and state someone is medically stable to leave my emergency department and later on they have an outcome like that, then I'm certainly not taking care of the patient in their best interests.

And so the evaluation proceeded because I wanted to make sure I wasn't missing any potentially life-threatening conditions."

Dr. Proust explained further that he did not know if there was an immediate need to intervene but, rather, there was the potential that there was an immediate need to intervene. As such, he wanted to administer Narcan, a reversal agent for narcotic overdose. Narcan also serves as a diagnostic tool because suspicion of a narcotic overdose increases where a person wakes up and remains conscious and alert after receiving Narcan. The Narcan was administered during the process of obtaining the urine for a drug screen. Allen received the Narcan at 3:27 a.m.

Because he could not rule out the life-threatening possibility of a Soma and tricyclic interaction without getting a lab test, Dr. Proust believed that there was an immediate need to administer lab tests to Allen and dose her with Narcan and Actidose. When asked whether he could indicate to a reasonable degree of medical certainty that observing Allen for another hour or few hours would have had any detrimental effect on her health at the time he elected to forcibly take the blood and urine, Dr. Proust responded, "It could have. I'm dealing with them prospectively, not retrospectively. It's prospectively. It could have been deleterious to wait and observe." Dr. Proust explained that "I don't want to observe someone have an airway compromise. I want to try to intervene or know I want to try to intervene before that happens. I want to try to anticipate that happening. I want to see if there is [sic] other medications involved that could, you know, potentially be a problem." When asked if, to a reasonable degree of medical certainty, it was necessary to take the urine at the time it was taken or whether it could have been delayed, Dr. Proust said:

"It was a judgment. I made a judgment to get the information based on my assessment of the patient and her lack of cooperativity [sic], her aggressiveness, her somnolence, her inconsistency with the amount of Soma [that] was left, all that information I gave you before.

It was a judgment on my part to try to get as much information as I could so I knew what I was dealing with or to try to know what I was dealing with and, if necessary, to make an intervention. And I was prepared to make an intervention prior to that if I needed to based on her presentation or possible change in her presentation."

When asked about waiting for the patient to regain decision making capacity, Dr. Proust said:

"From the time I went into the room to the approximate time that a urine [sample] was obtained was a period of observation, and during that course there was no evidence of cooperatibility [sic] or capacity in that frame of time. There was that period of observation.

And had she taken other types of medications that I indicated, then I would want to interact as soon as possible to prevent any untoward side effects from them. So I did observe her, and there wasn't any evidence of her capacity based on the things I said before."

When asked whether proper protocol is to obtain surrogate consent when a patient is unable to consent and there is no immediate need to intervene, Dr. Proust said:

"I don't know of any proper protocol. All's [sic] I know is that she had a potential life-threatening problem by possible overdose. And if I didn't proceed with my evaluation or assessment, that could be potentially injurious to her.

So it was my decision to evaluate her to the best of my ability to make sure she didn't have any potential life-threatening situation."

Dr. Proust was unaware if anyone had tried to contact Denise Moriarity, whose name was on the prescription bottle of Soma. After the blood and urine draw, Allen became more cooperative with the examination. Lab tests revealed that Allen had taken other drugs in addition to Soma, such as benzodiazepines, marijuana, and opiates.

Plaintiff also moved for partial summary judgment, maintaining, among other things, that at the time defendants forcibly withdrew Allen's blood and urine, no efforts had been made to secure the consent of a surrogate consenter, and there did not exist an immediate need to intervene to prevent death or serious harm. Plaintiff sought summary judgment only as to liability.

On November 28, 2004, the circuit court granted defendants' motion for summary judgment and denied plaintiff's motion for partial summary judgment. The trial court reasoned as follows:

"I find first that the emergency exception is a viable defense and applies to the facts of this case. The record is clear that Plaintiff's condition indicated that she was significantly impaired and that the interventions performed without her consent were for the purpose of protecting her life and health. I agree with Defendant's position that the requirements of the Health Care Surrogate Act do not apply to the emergent situation demonstrated by the facts of this case, and to hold otherwise, would be an abrogation of the emergency exception and have a decided chilling effect on the rendering of emergency care in Illinois. The caselaw [sic] is clear that a physician's judgment is needed to establish the patient's incompetency and the need to protect life and health. As Dr. Proust's opinions on those issues are uncontroverted by any other medical testimony, Defendant must prevail."

Plaintiff subsequently filed a timely notice of appeal challenging the trial court's order granting summary judgment for defendants. Plaintiff does not appeal the trial court's order denying plaintiff's motion for partial summary judgment.

## II. ANALYSIS

Summary judgment is appropriate where the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. 735 ILCS 5 2--1005 (West 2002). A court considering such a motion must construe the pleadings, depositions, admissions, and affidavits strictly against the moving party and liberally in favor of the nonmoving party. Whitt v. State Farm Fire & Casualty Co., 315 Ill. App. 3d 658, 661 (2000). The purpose of summary judgment is not to try a question of fact, but to determine whether one exists. Robidoux v. Oliphant, 201 Ill. 2d 324, 335 (2002). We review de novo a trial court's ruling on summary judgment. Whitt, 315 Ill. App. 3d at 661-62.

At issue in this case is whether Dr. Proust's uncontroverted opinions regarding Allen's competency to refuse medical treatment and the existence of a medical emergency demonstrate that the emergency exception applies and thus, as a matter of law, shields defendants from liability for medical battery. Because there exist genuine issues of material fact regarding the applicability of the emergency exception to the informed consent rule, we hold that Dr. Proust's deposition testimony does not demonstrate the applicability of the emergency exception.

It is well established that, at common law, a patient's consent is required before a physician may administer any kind of medical treatment to that patient. In re Estate of Longeway, 133 Ill. 2d 33, 44 (1989). A corollary to the consent requirement is that a patient has the right to refuse medical treatment, even if the patient's life is in jeopardy. Longeway, 133 Ill. 2d at 45. Also well established is that a common-law battery is the unauthorized touching of the person of another. Gaskin v. Goldwasser, 166 Ill. App. 3d 996, 1011-12 (1988). At the crossroads of these well-established principles exists the tort of medical battery, which is the cause of action pursued by plaintiff in this case. In a medical-battery case, an injured party can recover by establishing either that there was no consent to the medical treatment performed, that the treatment was against the injured party's will, or that the treatment substantially varied from the consent granted. Hernandez v. Schittek, 305 Ill. App. 3d 925, 930 (1999). Under such circumstances, a battery has occurred because the person administering the medical care intentionally touched the person of another without authorization. Goldwasser, 166 Ill. App. 3d at 1012. In this case, plaintiff alleges a total lack of consent to the extraction of Allen's blood and urine.

There are exceptions to the requirement that medical providers obtain consent to medical treatment. At issue in this case is the common-law emergency exception. Based on the doctrine of implied consent (Curtis v. Jaskey, 326 Ill. App. 3d 90, 94-96 (2001)), the emergency exception was

first referenced in Illinois law in <u>Pratt v. Davis</u>, 118 Ill. App. 161, 165-66 (1905), <u>aff'd</u>, 224 Ill. 300 (1906) (also referring to the exception).  The supreme court most recently acknowledged the exception in <u>Longeway</u>, 133 Ill. 2d at 45.  "In ordinary circumstances, when a physician is confronted with a patient who is unable to consent and is in need of prompt medical attention, it is logical to assume that the patient would consent to the procedure and imply the patient's consent from the circumstances."  <u>Curtis</u>, 326 Ill. App. 3d at 96.  Although originally borne from a case involving a surgical operation, the exception now extends "to virtually any medical procedure necessary to preserve the life or health of the patient."  <u>Barnes v. Hinsdale Hospital</u>, No. 85--C--4268 (N.D. Ill. 1985).

As its name implies, the emergency exception provides a defense to medical-battery claims asserted against medical professionals who render care in emergency situations. <u>Curtis</u>, 326 Ill. App. 3d at 94.  Because there is a dearth of Illinois case law applying the exception, we turn to Illinois Pattern Jury Instructions, Civil, No. 105.07 (2005), for the elements of the exception.  The instruction provides that a medical professional is not required to obtain consent to medically treat a patient if "an emergency arises and treatment is required in order to protect the patient's health, and it is impossible or impractical to obtain consent either from the patient or from someone authorized to consent for him."  Illinois Pattern Jury Instructions, Civil, No. 105.07 (2005); accord <u>Canterbury v. Spence</u>, 464 F.2d 772, 788-89 (D.C. Cir. 1972); <u>Rodriguez v. Pino</u>, 634 So. 2d 681, 687 (Fla. Dist. App. 1994); <u>Shine v. Vega</u>, 429 Mass. 456, 465, 709 N.E.2d 58, 64 (1999); <u>Estate of Leach v. Shapiro</u>, 13 Ohio App. 3d 393, 395, 469 N.E.2d 1047, 1052 (1984); <u>Miller v. Rhode Island Hospital</u>, 625 A.2d 778, 784 (R.I. 1993).  An additional element of the common-law emergency exception was recognized by this court in <u>Curtis</u>.  Citing section

892D of the Restatement (Second) of Torts (Restatement (Second) of Torts §892D (1979)), we recognized that the emergency exception does not apply where the medical provider has reason to believe that the patient, if he or she had the opportunity to consent, would decline. Curtis, 326 Ill. App. 3d at 96-97.

Thus, there are four essential elements required to establish that the common-law emergency exception applies: (1) there was a medical emergency; (2) treatment was required in order to protect the patient's health; (3) it was impossible or impractical to obtain consent from either the patient or someone authorized to consent for the patient; and (4) there was no reason to believe that the patient would decline the treatment, given the opportunity to consent. As such, we must determine whether defendants have established that no genuine issue of material fact exists with respect to each element of this defense.

A. The Existence of a Medical Emergency and the Necessity of Medical Treatment

With respect to the first and second elements, defendants argue that Dr. Proust testified that there was a medical emergency in the form of a possibility of a potentially life-threatening drug overdose, and that there was an immediate need to perform a drug screen to determine if Allen was in peril. Defendants conclude that, because plaintiff failed to present expert medical testimony contradicting Dr. Proust's opinion, Dr. Proust's determination that a medical emergency existed should be taken as true. We agree.

The existence of a medical emergency involves the assessment of the patient's medical condition and, therefore, must be established by expert testimony. Curtis, 326 Ill. App. 3d at 93, citing Schindel v. Albany Medical Corp., 252 Ill. App. 3d 389, 398 (1993). Generally, an averment made in an affidavit or deposition in support of a motion for summary judgment that is not controverted by a counteraffidavit or counterdeposition will

be taken as true, notwithstanding the opposing party's contrary allegations in his complaint or answer that merely purport to establish <u>bona</u> <u>fide</u> issues of fact. <u>Heidelberger v. Jewel Cos.</u>, 57 Ill. 2d 87, 92-93 (1974); <u>Fooden v. Board of Governors</u>, 48 Ill. 2d 580, 587 (1971); <u>Kennedy v. First National Bank of Mattoon</u>, 259 Ill. App. 3d 560, 564 (1994); <u>Skipper Marine Electronics, Inc. v. United Parcel Service, Inc.</u>, 210 Ill. App. 3d 231, 236 (1991). Under such circumstances, the nonmoving party risks summary judgment in favor of the moving party. <u>Rohe v. Shivde</u>, 203 Ill. App. 3d 181, 192 (1990). Indeed, summary judgment is proper even if supported by nothing more than a defendant-doctor's uncontradicted averments. See <u>Prather v. Decatur Memorial Hospital</u>, 95 Ill. App. 3d 470, 473 (1981).

At his deposition Dr. Proust testified that there was a medical emergency. Specifically, Dr. Proust explained that if Allen took an overdose of tricyclic medication, she could suddenly lose consciousness, lose blood pressure, not control her airway, and possibly aspirate if she vomited. Additionally, he testified that there was an immediate need to perform a drug screen to determine what Allen had taken, so that he could treat a potentially life-threatening overdose if necessary. Dr. Proust said that if he did not test for it, and she had taken a tricyclic, even though he might be observing her, he might intervene too late. Plaintiff does not argue that the diagnostic nature of the requisite drug screen was not treatment. Because plaintiff pointed to no expert medical testimony in a counteraffidavit or counterdeposition to controvert this opinion, we must take Dr. Proust's testimony as true in assessing whether summary judgment was appropriate in this case. See <u>Heidelberger</u>, 57 Ill. 2d at 92-93; <u>Curtis</u>, 326 Ill. App. 3d at 93. Moreover, plaintiff has presented nothing that would

otherwise put Dr. Proust's medical opinion into question.  See Grote v. Estate of Franklin, 214 Ill. App. 3d 261, 273 (1991).

We do not share the specially concurring justice's view that a purported discrepancy as to the time that Allen arrived at the emergency room creates a genuine issue of material fact regarding the existence of a medical emergency.  While there is an inconsistency between Dr. Proust's statement in the Emergency Department Report that "[Allen] arrived to the emergency department at 2:45 a.m." and his acknowledgment of the nurse's note that indicates Allen was triaged by emergency department nurses at 1:15 a.m., we do not believe this apparent error creates a genuine issue of material fact as to whether there was a medical emergency that required treatment to protect Allen's health. Whether Allen waited 42 minutes or 2 hours and 12 minutes before the drug screen was ordered, Dr. Proust testified unequivocally during his deposition that he first saw Allen at 2:45 a.m., that he then read the nurse's note regarding the triage of Allen, that urine and blood were extracted from Allen at 3:27 a.m., and that medication was administered at the same time. Whether Allen arrived at the emergency department at 1:15 a.m. or 2:45 a.m., we cannot conclude, without expert medical testimony indicating otherwise, that this time discrepancy had any bearing on the accuracy of Dr. Proust's diagnosis, medical judgment, and treatment decisions.  Without such testimony, Dr. Proust's expert medical opinion that there was a medical emergency in the form of an immediate need to perform a drug screen on Allen to determine if she was in potential peril, remains uncontradicted.  Once Dr. Proust examined Allen and gathered all available information, he concluded that there was the possibility that Allen ingested a large quantity of Soma in a short period of time, and based on her inattentiveness to his questions and general uncooperativeness, he could not

determine whether she was in a life-threatening situation, including the possibility of her airway becoming compromised due to her ingestion of other substances, without performing a diagnostic drug screen. Plaintiff has presented nothing, and the record reveals nothing, to contradict Dr. Proust's medical opinion. For these reasons we believe that there is no genuine issue of material fact as to the existence of a medical emergency or the necessity of treatment to protect Allen's health. Thus, defendants have established that there exists no genuine issue of material fact regarding the first and second elements of the common-law emergency exception to the informed consent rule.

### B. Impossibility or Impracticality of Obtaining Consent

#### 1. Consent From Allen

In this case, plaintiff argues that a medical battery occurred when defendants proceeded to extract blood and urine samples from Allen, despite her explicit refusal to consent to the treatment. Defendants counter that, although Allen did refuse to consent, her impaired state rendered her incapable of doing so. Citing a Rhode Island Supreme Court case, Miller v. Rhode Island Hospital, 625 A.2d 778 (R.I. 1993), plaintiff responds by positing that intoxication or impairment does not necessarily render one incapable of refusing to consent and, regardless, whether intoxication or impairment affects capacity to make medical decisions is a question of fact.

The propositions plaintiff references are not absolute rules. Indeed, in Miller, the court decided to "evaluate mental capacity according to the particular circumstances involved rather than derive it from a general presumption." Miller, 625 A.2d at 785. In doing so, the court determined that, despite a doctor's opinion that the plaintiff was incapable of making medical decisions, a question of fact existed as to capacity, where the particular circumstances indicated that, although the plaintiff's blood-alcohol content was 0.233, he was able to identify where his pain was, to

question the doctor about the recommended procedure, to sit up, to engage the doctor in a dialogue, and to evaluate the state of his own body. Miller, 625 A.2d at 779-80, 786.

Unlike the patient in Miller, Allen was uncooperative, unresponsive, and violent. According to triage notes made by the nursing staff, she was disoriented as to time and date upon her arrival at the emergency room. Her speech was slurred, she was unable to ambulate without stumbling, and she was unable to hold herself up. All of these factors indicate that Allen was in an extreme state of impairment and support Dr. Proust's uncontroverted opinion that she was incapable of refusing to consent to medical treatment.

Nevertheless, plaintiff further argues that pursuant to the Health Care Surrogate Act (the Act) (755 ILCS 40/1 et seq. (West 2004)), we should presume that Allen had decisional capacity, because, although Dr. Proust made a written finding of Allen's incapacity, he failed to obtain a concurrence from another physician. This argument fails, however, because, for the reasons stated in the next section, we refuse to join plaintiff in the presumption that the mandates of the Act apply to emergency medical treatment. Also, although a patient's estate is recognized as having a private right of action under the Act for violations of the Act (Ficke v. Evangelical Health Systems, 285 Ill. App. 3d 886, 894 (1996)), plaintiff is not proceeding under the Act but, rather, brings a claim for common-law medical battery. Thus, the presumption that a person has decisional capacity that arises under the Act is inapplicable here.

Additionally, even if the Act's presumption of decisional capacity was applicable here, defendant's argument fails because the presumption that Allen had decisional capacity was overcome by Dr. Proust's written determination that she did not, and there was no need for another physician to concur in Dr. Proust's determination. Section 20(c) provides in pertinent part:

"For purposes of this Act, a patient or surrogate decision maker is presumed to have decisional capacity in the absence of actual notice to the contrary without regard to advanced age. With respect to a patient, a diagnosis of mental illness or mental retardation, of itself, is not a bar to a determination of decisional capacity. A determination that an adult patient lacks decisional capacity shall be made by the attending physician to a reasonable degree of medical certainty. The determination shall be in writing in the patient's medical record and shall set forth the attending physician's opinion regarding the cause, nature, and duration of the patient's lack of decisional capacity. Before implementation of a decision by a surrogate decision maker to forego life-sustaining treatment, at least one other qualified physician must concur in the determination that an adult patient lacks decisional capacity." 755 ILCS 40/20(c) (West 1998).

As such, another qualified physician's concurrence in Dr. Proust's determination that Allen lacked decisional capacity was required only if a decision by a surrogate decision maker to forego life-sustaining treatment was possible. Section 10 of the Act provides:

" 'Life-sustaining treatment' means any medical treatment, procedure, or intervention that, in the judgment of the attending physician, when applied to a patient with a qualifying condition, would not be effective to remove the qualifying condition or would serve only to prolong the dying process. Those procedures can include, but are not limited to, assisted ventilation, renal dialysis, surgical procedures, blood transfusions, and the administration of drugs, antibiotics, and artificial nutrition and hydration." 755 ILCS 40/10 (West 1998).

Section 10 also defines qualifying condition:

" 'Qualifying condition' means the existence of one or more of the following conditions in a patient certified in writing in the patient's medical record by the attending physician and by at least one other qualified physician:

(1) 'Terminal Condition' means an illness or injury for which there is no reasonable prospect of cure or recovery, death is imminent, and the application of life-sustaining treatment would only prolong the dying process.

(2) 'Permanent unconsciousness' means a condition that, to a high degree of medical certainty, (i) will last permanently, without improvement, (ii) in which thought, sensation, purposeful action, social interaction, and awareness of self and environment are absent, and (iii) for which initiating or continuing life-sustaining treatment, in light of the patient's medical condition, provides only minimal medical benefit.

(3) 'Incurable or irreversible condition' means an illness or injury (i) for which there is no reasonable prospect of cure or recovery, (ii) that ultimately will cause the patient's death even if life-sustaining treatment is initiated or continued, (iii) that imposes severe pain or otherwise imposes an inhumane burden on the patient, and (iv) for which initiating or continuing life-sustaining treatment, in light of the patient's medical condition, provides only minimal medical benefit."  755 ILCS 40/10 (West 1998).

Dr. Proust's diagnosis was that Allen had possibly ingested a combination of drugs, including the muscle relaxant Soma, that could potentially compromise her airway.  Allen clearly did not have a terminal condition, was not permanently unconscious, and was not afflicted with an incurable or irreversible condition as those terms are defined by the Act.  Moreover, there was no written

certification made in Allen's medical record that she had one of these qualifying conditions. The Act makes clear that "decisions to forego life-sustaining treatment may be made only when a patient has a qualifying condition." 755 ILCS 40/20(b--5)(1) (West 1998). Consequently, a decision to forego life-sustaining treatment in this case was not possible and, in turn, a concurrence by another qualified physician with Dr. Proust's written determination that Allen lacked decisional capacity was not required to overcome the presumption of decisional capacity imposed by the Act.

For these reasons, and because the particular circumstances of this case support Dr. Proust's uncontroverted opinion, we find no genuine issue of material fact regarding Allen's decisional incapacity. Consequently, there was no genuine issue of material fact as to the impossibility or impracticality of obtaining consent to the treatment from Allen herself.

### 2. Consent from Someone Authorized to Consent for Allen

Plaintiff argues in the alternative that, despite Allen's lack of decisional capacity, a medical battery occurred. Once again pointing to the Act, plaintiff avers that section 40/20(b--5) (755 ILCS 40/20(b--5) (West 1998)) required defendants to consult with either a surrogate decision maker or, upon determining after reasonable inquiry that a surrogate was unavailable, a court-appointed guardian before proceeding to extract urine and blood from Allen by force. Defendants' failure to do so, according to plaintiff, evidences a lack of consent and, therefore, a medical battery. We disagree.

In his argument, plaintiff assumes that the Act is applicable to emergency health care situations and that the protocol for identifying a surrogate decision maker under the Act defines the "impossibility or impracticality of obtaining consent from someone authorized to consent on the patient's behalf" element of the emergency exception. For the reasons that follow, we hold that the Act does not apply to emergency medical treatment administered without informed consent. We hold further that compliance with the Act's protocol for the identification of a surrogate decision

maker is not required in order to establish the "impossibility or impracticality" element of the emergency exception to the informed consent rule.

Unlike the emergency exception to the informed consent rule, the Act does not outline the prerequisites to the lawful administration of medical treatment without some form of actual consent. Rather, the Act is intended to define the circumstances under which surrogate decision makers can make medical treatment decisions and decisions to terminate or forego life-sustaining treatment on behalf of patients lacking decisional capacity who have not executed advanced directives. 755 ILCS 40/5, 15 (West 1998). Simply stated, the Act provides a means of obtaining consent, while the common-law emergency exception provides a means of obviating consent.

The protocol of the Act that plaintiff would have us apply in emergency medical situations is as follows. After the attending physician makes a determination that the patient lacks decisional capacity, the health care provider must first make a reasonable inquiry as to the availability and authority of a health care agent under the Powers of Attorney for Health Care Law (755 ILCS 45/4--7(a) (West 1998)). 755 ILCS 40/25(a) (West 1998). If no health care agent is authorized and available, the health care provider must make a reasonable inquiry as to the availability of possible surrogates in the following priority: the patient's guardian of the person, the patient's spouse, any adult son or daughter of the patient, and either parent of the patient. 755 ILCS 40/25(a) (West 1998). If a surrogate decision maker is identified and available, his or her decision-making authority under the Act depends on the condition of the patient lacking decisional capacity. 755 ILCS 40/25(a) (West 1998). If the patient has a qualifying condition, medical treatment decisions including whether to forego life-sustaining treatment on behalf of the patient may be made. 755 ILCS 40/25(a)(ii) (West 1998). If, however, the patient does not have a qualifying condition, the surrogate may make medical treatment decisions, but may not decide to forego life-sustaining treatment. 755

ILCS 40/25(a)(i), 20(b--5) (West 1998). Section 30 of the Act provides that health care providers "have the right to rely on any decision or direction by the surrogate decision maker *** that is not clearly contrary to this Act, to the same extent and with the same effect as though the decision or direction had been made or given by a patient with decisional capacity." 755 ILCS 40/30 (West 1998). Lastly, sections 20(b--5)(2) and 25(b) and (d) provide for court-appointed guardians to serve in the place of surrogate decision makers under authority of the Act.

The Act delineates when a health care provider can rely on consent from someone other than the patient in the absence of an advanced directive of some form. The Act does not, however, speak to the circumstances where a health care provider can administer medical treatment without consent in any form. In contrast, the emergency exception to the informed consent rule, the legal defense with which we are presently concerned, does establish the prerequisites to administering medical treatment without any actual consent. As such, the Act has a different purpose than does the emergency exception to the informed consent rule, and the Act does not provide that its protracted and elaborate protocol for identifying a surrogate decision maker serves as the standard for establishing the "impossibility or impracticality" element of the emergency exception to the informed consent rule. The protocol of the Act is not appropriate for emergency medical situations. Consequently, we hold that the emergency exception to the informed consent rule is a viable defense against plaintiff's medical-battery claim, irrespective of evidence of defendants' failure to follow the Act's protocol for locating a surrogate decision maker.

We also note, however, that defendants have ignored the second component of the third element of the emergency exception. Defendants have not established that there is no genuine issue of material fact as to the impossibility or impracticality of obtaining consent from someone authorized to consent to the drug screen procedure on Allen's

˘21˘

behalf (see <u>Curtis</u>, 326 Ill. App. 3d at 94). The only evidence on this issue was Dr. Proust's deposition testimony where he indicated that he was not aware of any hospital protocol with respect to obtaining consent from someone authorized to consent for an incapacitated patient, and that he was unaware if anyone tried to contact Denise Moriarity, whose name was on the prescription bottle of Soma. As such, defendants have failed to provide testimony to explain why obtaining consent from someone empowered to consent for Allen, possibly including her sister Denise Moriarity, before Allen was treated was impossible or impractical. It may be that there simply was no time to obtain consent from someone authorized to do so. But this case does not involve a situation in which the court could make that inference. Rather, defendants must provide this information by some appropriate means before the issue can be resolved on a summary judgment basis.

While it is true that plaintiff has not presented any evidence indicating that it was possible and practical to obtain consent from someone authorized to consent for Allen, it is also true that, at least with respect to defendants' motion for summary judgment, plaintiff is not so obligated. A defendant moving for summary judgment bears the initial burden of coming forward with competent evidence that, if uncontradicted, entitles him to judgment as a matter of law, and only if the defendant satisfies his initial burden of production does the burden shift to the plaintiff to present some factual basis that would arguably entitle it to a favorable judgment. *Paul H. Schwendener, Inc. v. Jupiter Electric Co.*, 358 Ill. App. 3d 65, 76 2005. Consequently, summary judgment was inappropriate in this case.

### C. Reason to Know Allen Would Not Consent if Capable

With respect to the fourth element of the emergency exception, defendants had to establish that there was no genuine issue of material fact as to whether Dr. Proust had a

reason to believe that Allen would refuse to consent to the treatment, if she was capable of doing so. The parties have offered no guidance on this issue as neither recognizes this element of the emergency exception to the informed consent rule. We have carefully reviewed the record, including Dr. Proust's deposition testimony and the Emergency Department Report. Dr. Proust was not asked at his deposition whether he had a reason to believe that Allen would refuse to consent to the treatment if she was capable, nor does anything in the record support the conclusion that he did not have such a belief. In this case there is no evidence even to establish that July 6, 1999, was the first time Dr. Proust treated or met Allen. Nor is there any other evidence in the record from which we can conclude that there is no genuine issue of material fact with respect to this last element of the emergency exception to the informed consent rule.

## III. CONCLUSION

Because genuine issues of material fact exist as to whether obtaining the consent of someone authorized to consent for Allen was impossible or impracticable and whether Dr. Proust had a reason to believe that Allen would refuse to consent to the treatment if she was capable, we reverse the decision of the circuit court of Winnebago County granting summary judgment in favor of defendants. We remand this cause for further proceedings.

Reversed and remanded.

GILLERAN JOHNSON, J., concurs.

JUSTICE McLAREN, specially concurring:

By mechanically yet inconsistently applying some general rules of summary judgment jurisprudence, and ignoring others, the majority creates an outcome that distorts the very rules that it claims to follow. While I concur in the ultimate decision reversing the grant of summary judgment,

I disagree with the analysis of the majority that fails to find a genuine issue of material fact as to whether an emergency existed to warrant the grant of summary judgment by the trial court.

The majority correctly states the general rule that, when an averment made in an affidavit or deposition in support of a summary judgment motion is not controverted in a counteraffidavit or counterdeposition, the averment will be taken as true, and summary judgment may properly be granted "even if supported by nothing more than a defendant-doctor's uncontradicted averments." (Emphasis added.) Slip op. at 13. The majority also correctly notes that Dr. Proust's deposition testimony was not contradicted by a counteraffidavit or counterdeposition submitted by plaintiff. However, the majority fails to recognize that this general rule has no application in this case; while Dr. Proust's averments were not contradicted in another deposition or affidavit, they were controverted by evidence submitted by defendants themselves.

Dr. Proust's Emergency Department Report states that Allen arrived at the emergency department at 2:45 a.m. During his deposition, however, Dr. Proust was shown an "E.D." nursing assessment that contained triage notes timed at 1:15 a.m. Allen was treated at approximately 3:27 a.m. Therefore, Allen was in the hospital either less than 45 minutes or more than 2 hours before she was treated. This is not a de minimis discrepancy of a couple of minutes, and we cannot overlook its impact on whether there is a genuine issue of material fact regarding the existence of a medical emergency in this case.

Time is a constituent element of an emergency. If this was an emergency situation, why was Allen not treated for more than two hours? Even a 45-minute wait to begin treatment raises a question about the existence of an emergency. In any event, defendants have not made clear the exact time frame involved in this case. With the appropriate time frame in doubt, any opinion from anyone, medical doctor or layman, is pure speculation. If Dr. Proust had reconciled

this discrepancy and testified that an emergency existed despite the discrepancy, then there would not be a material issue of fact.  By itself, this unreconciled discrepancy of 90 minutes creates a genuine issue of material fact (even in the absence of a counteraffidavit or counterdeposition filed by plaintiff).

This court has long held that, even if a party opposing a motion for summary judgment fails to file a counteraffidavit, the movant is not entitled to summary judgment unless his motion and supporting affidavits establish his right to summary judgment as a matter of law.  See Rumford v. Countrywide Funding Corp., 287 Ill. App. 3d 330, 335 (1997); Pease v. International Union of Operating Engineers Local 150, 208 Ill. App. 3d 863, 874 (1991).  The majority has created new law; not only does it require a question of fact to exist based on the totality of the pleadings and the testimonial evidence, it requires the party opposing a summary judgment motion to controvert in its own evidence all that is contained in the movant's pleadings and evidence, even if the movant's own submissions are inconsistent and create a material question of fact.  The majority also ignores the general rules of summary judgment jurisprudence that: (1) the pleadings, depositions, admissions, and affidavits are to be strictly construed against the movant and liberally in favor of the nonmoving party; and (2) summary judgment should be granted only where there is no genuine issue of material fact and where the right of the moving party is clear and free from doubt.  See Burns v. Grezeka, 155 Ill. App. 3d 294, 297 (1987).  A movant's pleadings and evidence are to be construed against the movant; if an inconsistency or material discrepancy exists in these submissions, there is no requirement that the respondent must additionally create a discrepancy in his own submissions.  Furthermore, the right of the moving party must be clear and free from doubt; how can the movant's right be free from doubt if the movant himself creates a doubt by submitting inconsistent

material evidence and an opinion that does not address the inconsistency? The majority has flipped the burden of proof from the movant to the respondent and has recast the law to allow summary judgment despite inconsistencies or contradictions contained in the movant's portion of the record. The majority further increases the newly created burden on the respondent by requiring that a respondent controvert expert medical opinion with a counteraffidavit or counterdeposition containing its own underlined expert testimony. See slip op. at 15. Expert testimony is not required to controvert the underlying facts upon which an expert medical opinion is based. A doctor may testify in a deposition that, in his expert medical opinion, a shot of penicillin was the proper medical response to a list of symptoms presented and a given diagnosis. However, such evidence does not require expert medical testimony to controvert when the patient entered the emergency room or whether the doctor who administered the shot looked in the patient's file, where the patient's allergy to penicillin was clearly noted. In this case, the underlying fact of when Allen arrived in the emergency room is at issue. Allen was not required to controvert this fact, since it was controverted by defendants' own evidence. Furthermore, such a fact need not be controverted by expert medical testimony, as the majority claims, in order to create doubt as to the right to summary judgment.

The majority's error continues throughout its analysis, affecting the issues of obtaining Allen's consent or the consent of a surrogate. Again, because of the inconsistencies in defendants' evidence, we do not know when the "emergency" arose; consequently, it is also unclear as to whether Allen was incompetent to refuse treatment at 1:15, 2:45, or 3:27 a.m. The timing of the "emergency" as related to Allen's competency also affects whether a surrogate's consent could have been sought and obtained. Without a fixed time line, Dr. Proust's opinions are nothing more than speculation, and genuine issues of material fact abound.

The majority fails to address, let alone reconcile, these underlying questions of fact. While the majority reaches a "correct" outcome by reversing the grant of summary judgment and remanding this case for further proceedings, its improper analysis distorts the law of summary judgment. I submit that the defect in the analysis of the majority disposition will be made apparent to the trial court if the jury is not allowed to determine if an emergency existed but is allowed to consider the discrepancy in the length of time contained in the record in determining whether defendants failed to timely act to obtain the consent of a surrogate. The majority has already determined that, despite two time frames, the emergency was established as a matter of law. Apparently, the jury will have to decide whether the emergency was a "big" emergency or a "little" emergency. I submit that the jury should decide whether there was an emergency and what the proper time frame was to measure any and all acts of defendants alleged to have been improper.

Therefore, because I disagree with the analysis of the majority determining that an emergency was established as a matter of law, I specially concur with the majority opinion that determines that the judgment should be reversed and the cause remanded to the trial court for further proceedings.